# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MICHELLE MAZZOLA, in her individual capacity and in her capacity as mother of BABY DOE, GUY MAZZOLA, in his individual capacity and in his capacity as father of BABY DOE, AMEC, LLC, and LISA KULLER, on behalf of themselves and all others similarly situated, | Case No. 25-cv-01433 |
| | Judge Omar A. Williams |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ANTHEM HEALTH PLANS, INC., CARELON BEHAVIORAL HEALTH, INC., and ELEVANCE HEALTH, INC. | |
| Defendants. | |

Plaintiff Michelle Mazzola, in her individual capacity and in her capacity as the mother of Baby Doe, Plaintiff Guy Mazzola, in his individual capacity and in his capacity as the father of Baby Doe, Plaintiff Amec, LLC ("Amec"), and Plaintiff Lisa Kuller in her individual capacity, bring this class action for damages, equitable relief, and injunctive relief against Anthem Health Plans, Inc. ("Anthem"), Carelon Behavioral Health, Inc. ("Carelon"), and Elevance Health, Inc. ("Elevance") (together "Defendants"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, their own investigation, and the investigation of their counsel, and on information and belief as to all other allegations.

## NATURE OF THE ACTION

1.     There is a mental health crisis in this country and in this state. It is afflicting men and women, children and adults, and people of all income levels and backgrounds. And it is exacerbated by companies, like Defendants, that mislead vulnerable individuals in need of

qualified mental health providers by publishing grossly inaccurate directories of doctors and therapists. These inaccurate directories are known as "ghost networks."

2.    Autism Spectrum Disorder (ASD) is also pervasive in the United States. Treating autism, particularly in children, often requires intensive and specialized care. Defendants' "ghost networks" have made it nearly impossible for Plaintiff to find the care required to treat ASD.

3.    Ghost networks are directories of supposedly available, in-network providers that contain so many errors and duplications, the network is largely illusory. Behavioral health provider directories are more likely than any other medical specialty to be ghost networks.

4.    Defendants' intentional publication of an inaccurate provider directory is not just an inconvenience for people searching for behavioral health providers; it is far more insidious and costly. By publishing an inaccurate provider directory where over 70% of doctors listed do not exist, are not actually in-network, do not accept new patients, or have other inaccurate information listed, Defendants misled and deceived Plaintiffs.

5.    Defendants further mislead, defraud, and harm people by telling them there are in-network providers who accept the insurance and new patients when they do not; by denying covered services; by failing to properly apply members' out-of-pocket expenditures to deductibles; and by failing to reimburse members reasonable or consistent amounts when they use out-of-network providers.

6.    Because of these ghost networks, many insurance customers—including Plaintiffs—have suffered damages. Plaintiffs have had to utilize out-of-network providers and, as a result, have incurred thousands of dollars in unexpected and unfair behavioral health-related expenses.

7.    Ghost networks also exacerbate patients' behavioral health problems. People using Defendants' provider directory are often desperate for care for themselves, their children, or their loved ones.

8.    Ghost networks also lead patients, including Plaintiffs, to delay treatment or abandon their search for care, resulting in serious mental health consequences and complications.

9.    Plaintiffs' insurance policies claim to cover behavioral health care with a robust network of available behavioral health providers made available by Defendants. In reality, that network is threadbare: there are very few behavioral health providers in Connecticut who actually take the insurance, are in-network, and accept new patients. Thus, the promised coverage is largely non-existent.

10.    Anthem knowingly and intentionally published an inaccurate and misleading provider directory in order to attract customers. Anthem, with the knowing assistance of Carelon and oversight of Elevance, is knowingly engaging in a deceptive and fraudulent advertising campaign intended to lure people (like Plaintiffs) into choosing their plan based on false promises of a robust and geographically comprehensive provider network. Anthem's directory is inaccurate in numerous ways: many of the providers listed do not exist, are not part of Anthem's network, do not offer the services or specialties for which they are listed, and/or are not (and have long not been) accepting new patients.  In addition, many of these and other providers are listed with inaccurate or non-working contact information, making them virtually impossible to reach.

11.    By publishing an inaccurate network directory, Anthem sends patients on a wild-goose chase searching for doctors supposedly covered by their plan. The time spent

reaching wrong numbers or encountering non-working numbers is not just valuable time wasted, it is discouraging, delays care, and often contributes to patients abandoning their search for care.

12.     For people seeking behavioral health care for themselves, their children, or their loved ones, this wild-goose chase for in-network doctors is not trivial; it is a time-consuming, exhausting, and frustrating experience that is detrimental to their mental health.

13.     Defendants' ghost networks violate state and federal law as alleged herein.

14.     Plaintiffs—and other members of the proposed class—have suffered substantial injury and damages. Defendants have not supplied the coverage they are contractually required to provide Plaintiffs, meaning Plaintiffs have paid premiums for coverage that they are not in fact receiving. In addition, Plaintiffs have paid large sums for out-of-network providers because there were no (or Plaintiffs could not reasonably find) qualified in-network providers within a reasonable distance from them. Moreover, Plaintiffs wasted time and money calling countless providers who Defendants represented as being in-network, qualified to treat their conditions, and accepting new patients, only to find out that the providers were not (and had long not been) in-network, qualified, and accepting new patients.

15.     This First Amended Complaint details misrepresentations, misstatements, and omissions by Defendants regarding their supposedly robust mental health provider network and the mental health benefits purportedly available to those, like Plaintiffs, who enrolled in Anthem's health insurance.  These misrepresentations, misstatements, and omissions are made in Defendants' provider directory, marketing materials, plan documents, and other places described in this First Amended Complaint. For ease of reading, these misrepresentations, misstatements, and omissions are often phrased in the present tense.  However, all of these misrepresentations,

misstatements, and omissions are not only currently being made, they were also made before and throughout Plaintiffs' enrollment in Anthem's health insurance.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims involve violations of federal law, including the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and the Mental Health Parity and Addiction Equity Act ("MHPAEA"), 42 U.S.C. § 300gg-26, incorporated into ERISA at 29 U.S.C. § 1185a.

17.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000 and at least one member of the proposed class is a citizen of a state other than that of the citizenship of the Defendants.

18.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants transact substantial business in this Judicial District.

## THE PARTIES

**I.    Plaintiffs**

19.    Plaintiff Michelle Mazzola is a member of the Anthem Silver Pathway CT PPO plan and has been a member since January 2024. Although the plan is currently an ERISA plan, it was a non-ERISA plan prior to 2025. She is a resident of New Canaan, Connecticut.

20.    Ms. Mazzola is the mother of Baby Doe, who is a two-year-old boy also covered by the Anthem Silver Pathway CT PPO plan.

21.     Plaintiff Guy Mazzola is a member of the Anthem Silver Pathway CT PPO plan and has been a member since January 2024. Although the plan is currently an ERISA plan, it was a non-ERISA plan prior to 2025. He is a resident of New Canaan, Connecticut. He is the Founder and President of Amec.

22.     Mr. Mazzola is the father of Baby Doe.

23.     Plaintiff Amec is a Connecticut company which contracted with Anthem to purchase and provide the Anthem Silver Pathway CT PPO insurance plan for Plaintiffs and other class members.

24.     Plaintiff Lisa Kuller is a member of the Anthem Blue Cross Blue Shield Bronze PPO Pathway plan, a non-ERISA plan, and has been a member since January 2025. She is a resident of Ridgefield, Connecticut.

## II.     Defendants

25.     Defendant Anthem Health Plans, Inc. is a Connecticut company that administers Plaintiffs' health insurance plan. Anthem reviews claims and exercises discretion in approving or denying claims for benefits under the plan. It is located at 108 Leigus Road, Wallingford, Connecticut, 06492 and is a wholly owned subsidiary of Elevance.

26.     Defendant Carelon Behavioral Health, Inc. is a Massachusetts-based company that is also a wholly owned subsidiary of Elevance. Carelon provides Anthem and Anthem's members with behavioral health services. Carelon's principal place of business is 200 State Street Suite 302, Boston, Massachusetts, 02109. Prior to March 2023, Carelon was known as Beacon Health Options.[1] Carelon provides behavioral health services – including making care and coverage decisions – to Anthem customers in Connecticut.

---

[1] Laura Lovett, *Elevance Health's Beacon Health Options Rebrands to Carelon Behavioral*

(continued…)

27.     Elevance Health, Inc. is an Indiana corporation with its principal offices at 220 Virginia Avenue, Indianapolis, Indiana, 46204. Elevance is the parent company of both Anthem and Carelon and, upon information and belief, sets policies for both subsidiaries and actively directs and controls Anthem's and Carelon's activities with respect to the coverage of services to members, the amount of deductibles, the approval of and delivery of benefits, and the reimbursement amounts to members, under all of Anthem's plans, including those in Connecticut. Upon information and belief, Elevance uses Anthem and Carelon to carry out its insurance plans throughout the country and actively manages its subsidiaries through centralized functions such as handling finances, information and technology systems, and claims processing.

28.     The relationship between Anthem, Carelon, and Elevance is close and inextricably intertwined. Correspondence from Anthem to Plaintiffs concerning care, coverage, and medical necessity decisions regularly include the statement, "Reviewed for your plan by Carelon Behavioral Health, Inc." Plaintiffs have contacted Anthem, left a message, and received a return call from someone at Carelon. Plaintiffs have also contacted the Anthem chat service and been told they were dealing with Carelon, and that Carelon was a subsidiary of Elevance.

## BACKGROUND & CONTEXT

### I.    The Mental Health Crisis in America

####     A)    The Adult Mental Health Crisis

29.     There is a mental health crisis in the United States. According to the National Survey on Drug Use and Health by the Substance Abuse and Mental Health Service

---

*Health, to Consolidate Payer's Portfolio of Services*, Behavioral Health Business (Mar. 2, 2023), https://bhbusiness.com/2023/03/02/elevances-beacon-health-options-rebrands-to-carelon-behavioral-health-to-consolidate-payers-portfolio-of-services/; Carelon Behavioral Health Home Page, https://www.carelonbehavioralhealth.com.

Administration, in 2022, there were an estimated 59.3 million adults in the U.S. with a mental illness. That is 23.1% of U.S. adults.[2]

30.    Younger adults reported a higher prevalence of mental health problems:

- ages 18–25: 36.2% of adults reported having a mental illness.

- ages 26–49: 29.4% of adults reported having a mental illness.

- ages 50+: 13.9% of adults reported having a mental illness.

31.    Some 49.4% of the 59.3 million adults with any mental illness did not receive mental health services within the previous year.[3]

32.    Treatment rates for adults aged 18–25 were lower than for all other adults: approximately 50.9% of the age group went without treatment.[4]

33.    In 2022, an estimated 15.4 million adults in the U.S. had a *serious* mental illness, some 6% of the population.[5] The National Institute of Mental Health defines serious mental illness as "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities," and it notes that "[t]he burden of mental illnesses is particularly concentrated among those who experience disability due to [serious mental illness]."[6]

---

[2] National Institute of Mental Health, *Mental Illness Statistics*, https://www.nimh.nih.gov/health/statistics/mental-illness.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

34.    In total, 33.3% of those with serious mental illness did not receive mental health services.[7]

**B)    The Child Mental Health Crisis**

35.    According to the Centers for Disease Control and Prevention ("CDC"), 3.2% of 8-year-olds have been diagnosed with ASD.[8] In addition, among adolescents aged 12 to 17 years old:[9]

- 15.1% have had a major depressive episode.

- 36.7% have had persistent feelings of sadness or hopelessness.

- 4.1% have had a substance use disorder.

- 1.6% have had an alcohol use disorder.

- 3.2% have had an illicit drug use disorder.

- 18.8% seriously considered attempting suicide.

- 15.7% made a suicide plan.

- 8.9% attempted suicide.

- 2.5% made a suicide attempt requiring medical treatment.

36.    The situation is so acute that the Surgeon General of the United States has described mental health as "the defining public health crisis of our time," and warned of the

---

[7] *Id.*

[8] Kelly A. Shaw et al., *Prevalence and Early Identification of Autism Spectrum Disorder Among Children Aged 4 and 8 Years — Autism and Developmental Disabilities Monitoring Network, 16 Sites, United States, 2022*, Ctrs. for Disease Control and Prevention (2025), https://www.cdc.gov/mmwr/volumes/74/ss/ss7402a1.htm.

[9] Rebecca H. Bitsko et al., *Mental Health Surveillance Among Children – United States, 2013–2019*, Ctrs. for Disease Control and Prevention (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm (citations omitted).

"devastating effects" of mental health challenges on young people.[10] This came as the suicide rate for young Americans jumped by 57 percent from 2009 to 2019, and pediatric visits for self-harm rose by 329 percent from 2007 to 2016.[11] The Surgeon General released a rare Advisory titled *Protecting Youth Mental Health*, urging that "every child ha[ve] access to high-quality, affordable, and culturally competent mental health care."[12]

37.      Compounding this crisis are serious barriers to accessing needed mental health treatment. The CDC estimates that of the one in five children who have a mental, emotional, or behavioral disorder, only approximately 20% receive care from a mental health provider.[13]

**C)      The Mental Health Crisis in Connecticut**

38.      According to Mental Health America, in 2024, an estimated 21% of adults in Connecticut, approximately 599,000 people, suffered from a mental illness.[14]

39.      According to the Kaiser Family Fund mental health survey of 2023:

- 28% of Connecticut adults reported symptoms of anxiety disorder.

- 18.8% of Connecticut adults reported symptoms of depressive disorder.

---

[10] Matt Richtel, *The Surgeon General's New Mission: Adolescent Mental Health*, N.Y. Times, (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/health/surgeon-general-adolescents-mental-health.html.

[11] *Id.*

[12] "A Surgeon General's Advisory is a public statement that calls the American people's attention to an urgent public health issue … . Advisories are reserved for significant public health challenges that need the nation's immediate awareness and action." *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory*, Off. of the Surgeon Gen. at 12 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[13] Ctrs. for Disease Control and Prevention, *Improving Access to Care, Children's Mental Health Care*, https://archive.cdc.gov/www_cdc_gov/childrensmentalhealth/access.html.

[14] The State of Mental Health in America, *2024 Edition*, 15, https://mhanational.org/wp-content/uploads/2024/12/2024-State-of-Mental-Health-in-America-Report.pdf.

- 31.7% of Connecticut adults reported symptoms of anxiety or depressive disorder.[15]

## II.    Autism is Highly Prevalent in the United States

40.    Autism Spectrum Disorder (ASD) is also highly prevalent in the United States, particularly among youth. The CDC estimates that about 1 in 31 (3.2%) of 8-year-old children have been identified with ASD.[16]

41.    Boys are three times likelier than girls to experience ASD.[17]

42.    When autism goes undiagnosed or untreated, individuals face substantial challenges across multiple domains of life. Individuals with untreated autism often face difficulties in building and maintaining relationships, as autism can impact social communication skills, making it challenging to initiate conversations, understand nonverbal cues, and develop meaningful connections with others, leading to feelings of isolation and exclusion.

43.    Individuals with untreated ASD face substantially elevated levels of co-occurring mental health conditions.[18]

44.    Early interventions to treat ASD in young children have been shown to significantly improve their "cognitive ability, daily living skills, and motor skills."[19]

---

[15] Kaiser Family Fund, *Adults Reporting Symptoms of Anxiety or Depressive Disorder During COVID-19 Pandemic*, https://www.kff.org/mental-health/state-indicator/adults-reporting-symptoms-of-anxiety-or-depressive-disorder-during-covid-19-pandemic/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[16] Ctrs. for Disease Control and Prevention, *Data and Statistics on Autism Spectrum Disorder* (May 27, 2025), https://www.cdc.gov/autism/data-research/index.html.

[17] *Id.*

[18] Maya G. Mosner et. al, *Rates of Co-occurring Psychiatric Disorders in Autism Spectrum Disorder Using the Mini International Neuropsychiatric Interview*, 49 J. of Autism and Developmental Disorders, 3819 https://doi.org/10.1007/s10803-019-04090-1.

[19] Sofia Daniolou et. al, *The Efficacy of Early Interventions for Children with Autism Spectrum*

(continued…)

III.    **Federal and State Requirements for Health Insurers**

A) **Federal and Connecticut State Law Impose Additional Obligations on Health Plans to Ensure Accuracy of Provider Directories**

45.    The federal government has expressed serious concern about ghost networks and the significant barriers they create to mental health care. In addition to the congressional inquiries and hearings, federal and state laws and regulations have been promulgated in an effort to protect consumers from the harms of ghost networks.

46.    In 2022, Congress passed the federal "No Surprises Act," which includes a section entitled "Protecting Patients and Improving the Accuracy of Provider Directory Information," establishing requirements for provider directories to help protect consumers from surprise bills from out-of-network providers.[20]

47.    The No Surprises Act requires health plans to publish and maintain accurate provider directories; specifically, insurance companies must update and verify their plans' provider directories at least every 90 days.[21] Where plans are unable to verify provider data, they must establish a procedure to remove providers from their directories.[22] Health plans must also update provider information within two business days of receiving an update from a provider.[23]

---

*Disorders: A Systematic Review and Meta-Analysis*, 11 J. of Clinical Medicine 17 (Aug. 30, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9457367/#sec4-jcm-11-05100.

[20] The State of Mental Health in America, *supra* n. 14.

[21] Kaiser Family Fund, *supra* n. 15.

[22] Pub. L. No. 116-260, 134 Stat. 1182, Division BB, (2020), https://www.congress.gov/bill/116th-congress/house-bill/133/text (adding 42 U.S.C. § 300gg, 29 U.S.C. § 1185i, and 26 U.S.C. § 9820).

[23] 42 U.S.C. § 300gg-115(a)(2)(A).

48.     The law also imposes obligations on health insurers directly in relation to their members. When a member requests information about whether a provider is in-network, the plan must respond within one business day of the request.[24] And where a member relies on inaccurate provider directory information and receives services from an out-of-network provider, the member will not be responsible for cost-sharing greater than in-network cost sharing.[25]

49.     Connecticut passed its own No Surprises law in 2015, which also requires health plans to ensure that their provider directories are accurate. Under Connecticut law, health insurers are required to update their provider directories within an even shorter time period: at least monthly, or when there is a material change to the provider's participation in the network. [26]

50.     State law also requires health plans to include in their directories whether a provider is accepting new patients and any restrictions on a provider's availability.[27]

51.     The Connecticut No Surprises law also provides for beneficiaries, enrollees, or participants to be reimbursed when they relied on an incorrect provider directory and paid a provider bill in excess of the in-network cost-sharing amount.

52.     Since state laws are not preempted by the federal No Surprises Act,[28] and as made clear by Connecticut's Insurance Department, health plans in Connecticut are still required to update their directories within 30 days of a provider change.

---

[24] 42 U.S.C. § 300gg-115(a)(2)(B). In addition, the terms of the contract between provider and plan may require the plan to remove the provider if the contract terminates.

[25] 42 U.S.C. § 300gg-115(b).

[26] 42 U.S.C. § 300gg-115(a)(3).

[27] 42 U.S.C. § 300gg-115(b)(1)(A).

[28] Conn. Gen. Stat. § 38a-477h, (b) (1).

53.    These federal and state laws reflect that governments recognize the harmful consequences of inaccurate provider directories. Despite these legislative efforts to shield consumers from ghost networks, surprise bills, and inadequate in-network care, the Defendants continue to violate these laws.[29]

**B)  Federal and Connecticut State Law Require Health Plans to Ensure Sufficient In-Network Behavioral Health Providers**

54.    There is an additional set of federal and state laws implicated by inaccurate provider directories: "network adequacy" laws require that health plans offer a network that includes a "sufficient" number of in-network providers.

55.    The Affordable Care Act first established this network adequacy framework, requiring that all qualified health plans[30] ensure the provision of a network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[31]

56.    Connecticut adopted this standard and applied it broadly to a majority of health plans offered in the state. Connecticut law requires health plans to ensure "that the preferred provider network has an adequate provider network taking into account the geographic

---

[29]  Conn. Gen. Stat. § 38a-477h (d)(1)(A).

[30]  "Nothing in this section shall be construed to preempt any provision of State law relating to health care provider directories." 42 U.S.C. § 300gg-139(e).

[31]  *See, e.g.*, Neel M. Butala et al., *Research Letter: Consistency of Physician Data Across Health Insurer Directories*, JAMA 329(10), 842 (Mar. 14, 2023), https://jamanetwork.com/journals/jama/article-abstract/2802329 (finding even after passage of No Surprises Act that "[i]n examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers").

distribution of enrollees and participating providers and whether participating providers are accepting new patients."[32]

57.    Specifically, Connecticut law provides that health insurers "maintain adequate arrangements to assure that such health carrier's covered persons have reasonable access to participating providers located near such covered persons' places of residence or employment. In determining whether a health carrier has complied with this subparagraph, the commissioner shall give due consideration to the availability of health care providers with the requisite expertise and training in the service area under consideration."[33]

58.    In addition, MHPAEA provides that mental health and substance use disorder benefits must not be provided on less favorable terms than medical and surgical benefits, specifically with respect to annual, aggregate, or lifetime limits on coverage, financial requirements, treatment limitations, and out-of-network coverage.[34]

59.    The Defendants are in violation of federal and state law requiring network adequacy.

### C)    ERISA Requires Covered Insurers to Meet Benefit Obligations, Uphold Fiduciary Responsibilities, and Provide Truth in Marketing

60.    ERISA was enacted by Congress in 1974 in recognition of the proliferation of employee benefit plans that directly impacted the well-being of millions of employees.[35] Broad

---

[32] "Qualified health plans" are plans sold on a state or federal exchange. *See* 42 U.S.C. § 18021 (defining term).

[32] 45 C.F.R. § 156.230(a)(1).

[33] Conn. Gen. Stat. § 38a-472f (e) (1)(A).

[34] 29 U.S.C. §1185a(a); 42 U.S.C. § 300gg-26(a).

[35] 29 U.S.C. § 1001(a).

federal legislation was deemed necessary, in part, to guard against exploitation of beneficiaries due to asymmetric information regarding plans.[36]

61.    To establish safeguards for beneficiaries, ERISA established national standards for employee benefit plans.[37]

62.    ERISA requires insurers to provide coverage in accordance with their plans; to resolve claims in accordance with their plans; to uphold the fiduciary duties of loyalty and care in administering their plans; and to ensure that no false statements or representations are made in connection with the marketing or sale of a plan.[38]

63.    MHPAEA is incorporated into ERISA at 29 U.S.C. § 1185a and generally requires that ERISA plans offer equally favorable coverage for mental health benefits and medical and surgical benefits.

**IV.    Ghost Networks**

64.    In May 2023, the United States Senate Finance Committee held a hearing on this topic, titled "Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks."[39]

---

[36] *Id.*

[37] *Id.*

[38] 29 U.S.C. §§ 1104, 1132, 1149.

[39] *Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*, U.S. Senate Fin. Comm. (May 3, 2023), https://www.finance.senate.gov/hearings/barriers-to-mental-health-care-improving-provider-directory-accuracy-to-reduce-the-prevalence-of-ghost-networks [hereinafter Senate Hearings on Mental Health Care].

65.    The issue of ghost networks and their attendant harms to consumers at large has been reported by *The New York Times*[40] and *The Washington Post*[41] among other publications.

66.    The American Medical Association co-authored a white paper on some of the financial and non-financial injuries from ghost networks:

> When directory information is inaccurate, patients experience inconvenience (non-working phone numbers, longer time to find the right practitioner), and financial consequences (unplanned out of pocket expenses). Directory errors may also result in a patient selecting a health plan based on inaccurate information about which clinicians are in-network.[42]

67.    A March 2022 report by the United States Government Accountability Office corroborated the findings outlined above, concluding that "consumers with coverage for mental health care experience challenges finding in-network providers,"[43] and that "[i]naccurate or out-of-date information on which mental health providers are in a health plan's network

---

[40] Jay Hancock, *Insurers' Flawed Directories Leave Patients Scrambling for In-Network Doctors*, N.Y. TIMES (Dec. 3, 2016), https://www.nytimes.com/2016/12/03/us/inaccurate-doctor-directories-insurance-enrollment.html.

[41] Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/.

[42] *Improving Health Plan Provider Directories*, CAQH & AM. MED. ASS'N., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf ("Among the more common resources that patients use are health plan provider directories which, according to two surveys conducted in 2020, more than half of patients use to select a physician.") (citations omitted) [hereinafter "Improving Health Plan Provider Directories"].

[43] *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts*, U.S. Gov't Accountability Office, Report to the Chairman, Comm. on Fin., U.S. Senate, 2, (Mar. 2022), https://www.gao.gov/assets/gao-22-104597.pdf.

contributes to ongoing access issues for consumers and may lead consumers to obtain out-of-network care at higher costs to find a provider."[44]

68.    In a study of adolescent psychiatrists in particular, researchers posing as parents seeking care for a child with depression were only able to obtain an appointment 17 percent of the time.[45]

## V.    Plaintiffs' "Secret Shopper" Studies

69.    In February 2025, counsel for Plaintiffs arranged for multiple simulated patient "secret shopper" surveys. These secret shopper studies were designed and conducted to recreate Plaintiffs' experiences. Plaintiffs' counsel used the same criteria each Plaintiff used when searching for mental health care: whether a psychologist, a therapist, or a psychiatrist. Counsel utilized experienced and qualified researchers to conduct the secret shopper studies. Based on Plaintiffs' actual experiences, counsel also designated the distances they were reasonably able to travel for an in-person appointment. If they were willing to use telehealth services, this too was noted. This information was then entered into Defendants' online search directory, which generated a list of supposedly in-network providers for each Plaintiff.

70.    Plaintiffs' counsel's outside researchers then called each of the listed providers. If an answering machine picked up the call, researchers left messages asking for a return call and made sure to call three times. For every completed call, researchers recorded the provider's

---

[44] *Id.* at 12.

[45] Shireen Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, INT'L J. HEALTH SERV. 47(4) (2017), https://pubmed.ncbi.nlm.nih.gov/28474997/ (studying availability of outpatient pediatrician and child psychiatry availability and finding that "[a]ppointments were obtained with 40% of the pediatricians and 17% of the child psychiatrists. The mean wait time for psychiatry appointments was 30 days longer than for pediatric appointments. Providers were less likely to have available appointments for children on Medicaid[.]").

response: whether they were indeed the type of provider listed in the directory; whether they

accepted the Anthem plan; whether the provider was accepting new patients; and if they were

accepting new patients, how long the wait was for an appointment.

71.     The details of each secret shopper study are below.

## FACTUAL ALLEGATIONS

**I.    Michelle Mazzola, Guy Mazzola, Amec, and Baby Doe**

72.     Plaintiffs Michelle Mazzola and Guy Mazzola (together "the Mazzolas") are

residents of New Canaan, Connecticut and the parents of two-year-old Baby Doe. The Mazzolas

have been members of the Anthem plan for more than two years.

73.     When selecting the Anthem plan, the Mazzolas relied on implicit and explicit

representations in marketing materials and on the Anthem website that the provider directories

were robust and accurate, especially with respect to behavioral health providers.

74.     When deciding to enroll in coverage through Anthem, the Mazzolas relied on

implicit and explicit representations by Anthem that the provider directory was robust and

accurate, especially with respect to behavioral health providers.

75.     Baby Doe was diagnosed with autism at the Yale Child Study Center in mid-

November 2024. However, Ms. Mazzola had begun her search for specialized providers several

months prior to the official diagnosis, after several medical professionals suggested that Baby

Doe be evaluated for ASD.

76.     From early November 2024 until late January 2025, Ms. Mazzola attempted to

find three kinds of providers for her son: an Applied Behavior Analysis (ABA) therapist, a

speech therapist, and an occupational therapist.

77.     Because of the inadequacy of the Anthem network, and because of the inaccuracy

of the Anthem directory, the Mazzolas have been forced use out-of-network providers to pay

thousands of dollars in out-of-pocket costs for Baby Doe's treatment, in addition to the thousands of dollars they have paid in premiums to Anthem.

      **A)**     **Search for a Behavioral Therapist**

78.     Ms. Mazzola searched for a behavioral therapist between November and December of 2024 using the Anthem provider directory. On the Anthem website, she filtered for autism and narrowed the distance to 20 miles from her home. She began by calling providers on the resulting list and then further narrowed her search to 10 miles, the distance she was reasonably able to travel with her son for in-person therapy. She was only able to travel 10 miles because her son becomes extremely agitated in the car after more than 20 minutes and is at risk of harming himself or others when removed from the seat. The frustration of being non-verbal and being confined is not a healthy combination for the child.

79.     Ms. Mazzola spent hours calling providers. Most did not answer. A few had voicemail and Ms. Mazzola left messages but never received call-backs. Some providers said there was a long waitlist. A large number of other providers did not provide the type of care that Ms. Mazzola had entered into the Anthem search directory despite the resulting Anthem directory listing those specific services for the contacted providers. And still other providers could not provide the care her son required, such as a full week of early intensive intervention. They were only able to offer once-a-week visits.

80.     After approximately a month of searching for an in-network behavioral therapy provider to no avail (during which time her son did not receive the time-sensitive medical care he needed), Ms. Mazzola searched for and found an out-of-network facility for young children with autism in a neighboring town that had immediate availability for her son. Ms. Mazzola's son had his first evaluation at the facility on December 6, 2024, then began with one-hour appointments around December 17, 2024, and soon transitioned to multi-hour appointments five days a week.

81.     While this facility is out of network, the Mazzolas received a six-month exception from Anthem. The company claimed that it would be treated as in-network but Ms. Mazzola would be responsible for the balance and for billing Anthem for reimbursement. Based on the Elevance policy, Anthem has reimbursed the Mazzolas for only 70–80% of the out-of-pocket costs for this therapy.

**B)     Search for a Speech Therapist**

82.     Ms. Mazzola searched for a speech therapist for her son between December 2024 and January 2025. This involved three separate and unsuccessful searches on the Anthem website for in-network providers. First, Ms. Mazzola attempted to find a speech language pathologist within 20 miles who specialized in developmental delays but there was only one who ever answered her calls. Then, she removed the filter for developmental delays and called every provider on that list, but many did not respond or did not offer the correct service for her son. Ms. Mazzola was unable to obtain the speech therapy services she sought for her son from any in-network provider within a 20-mile radius.

83.     Ultimately, after approximately a month of searching unsuccessfully in-network (during which time her son did not receive the time-sensitive medical care he needed), Ms. Mazzola found an out-of-network provider, located across the parking lot from the behavioral therapy facility where her son is enrolled. His first appointment was on January 13, 2025.

84.     Ms. Mazzola requested an exception from Anthem for speech therapy, but it was denied because there were supposedly providers available within a 100-mile radius – some of the cited providers would have taken the Mazzolas roughly two-and-a-half hours to reach by car. Ms. Mazzola could not drive the distance to any of the cited providers to take her son to speech therapy appointments, which he requires five days a week, because it is medically unsafe to keep her son restrained in a car seat for more than 20 minutes.

C)    **Search for an Occupational Therapist**

85.    Ms. Mazzola searched for an occupational therapist for her son in January 2025. She narrowed her search on the Anthem website to a 10-mile radius and called approximately 25 of the providers listed. When Ms. Mazzola searched for pediatric providers, nothing resulted, so she chose to ask providers directly over the phone whether they would accept children. Many providers did not pick up the phone, and others referred to themselves as "hand therapists" and did not actually offer occupational therapy. Others only offered rehabilitation services to adults, and two providers placed Ms. Mazzola's son on a waitlist and told her that even if he got off the waitlist, they would not be able to see him three days per week, which is what his referring doctor indicated that he required.

86.    After weeks of searching for an in-network occupational therapist (during which time her son did not receive the time-sensitive medical care he needed), Ms. Mazzola chose the out-of-network option, a facility also located across the parking lot from the behavioral therapy center where Baby Doe received treatment. Her son began his occupational therapy appointments during the last week of February 2025. Ms. Mazzola also enrolled her son in a second, part-time out-of-network occupational therapy facility for the weekends.

87.    Beyond the searches for behavioral therapy, speech therapy, and occupational therapy for her son, Ms. Mazzola has also recently experienced unsuccessful searches for in-network pediatric physical therapy, pediatric nutrition, and pediatric neurology doctors. She has found no providers within an hour-and-a-half drive from her home.

D)    **Out-of-Pocket Costs, Minimal Reimbursements, & Insufficient Deductible Credit**

88.    According to the Mazzolas' Anthem plan, "If there is no In-Network Provider who is qualified to perform the treatment You require, contact Us prior to receiving the service

or treatment, and We may approve an Out-of-Network Provider for that service as an Authorized

Service."[46] Despite this representation, the Defendants have consistently refused to approve

particular out-of-network providers that are appropriate for Baby Doe's treatment. The

Defendants then regularly fail to properly pay for the services performed by these providers,

placing an extraordinary financial burden on the Mazzolas.

89.     The Mazzolas repeatedly informed Anthem that there were no in-network

providers within a reasonable distance to treat their son.

90.     The Mazzolas have paid and continue to pay enormous out-of-pocket costs for

their son's therapy. For behavioral therapy, the cost per month has varied, as the number of hours

and days of treatment have increased since December. In December 2024, the Mazzolas paid

$3,081.25 for out-of-network care. The frequency of the child's therapy then increased

significantly, and the Mazzolas paid $9,187 for out-of-network providers in March 2025,

$10,153 in April, and $9,102.50 in May. The Anthem plan requires treating – and Anthem

representatives agreed to treat – these out-of-network providers as if they were in-network. That

would make the Mazzola's cost a 20% co-insurance. However, Anthem does not regularly

reimburse the Mazzolas and only does so at random intervals. Moreover, Anthem reimburses the

Mazzolas less than the 20% co-insurance amounts, often reimbursing them arbitrary and

inconsistent amounts. And further, Anthem regularly fails to credit the proper amount to the

Mazzolas' deductible obligation.

91.     For speech therapy, the Mazzolas currently pay approximately $600 a week. Baby

Doe goes to speech therapy five days a week for appointments that last between 30 to 45 minutes

(resulting in varying costs). Because Anthem denied Ms. Mazzola an exception whereby Anthem

---

[46] Certificate of Coverage at 38.

would cover a larger portion of this out-of-network expense – despite there being no in-network providers anywhere near the Mazzola residence – the Mazzola family is paying over $2,000 per month out-of-pocket for the child's speech therapy. Moreover, Anthem is failing to reimburse the family for this out-of-network care despite the clear statement in the Anthem certificate of coverage and in the Summary of Benefits and Coverage ("SBC") that the family's obligation is only a 50% co-insurance for an out-of-network provider, and only 20% if there is no qualified in-network alternative available. Further, Anthem is applying only small and arbitrary amounts of this expense to the family's annual deductible.

92.    For occupational therapy, the Mazzolas also use an out-of-network provider because they could not find anyone in-network. The family paid $280 and $300 for the two initial evaluations. Baby Doe's first appointment after the evaluations was $130, and the subsequent appointments since have cost between $105–$110 each. Baby Doe goes to occupational therapy two to three days a week. Anthem partially reimburses these appointments a small amount, but never more than $25 per treatment.

93.    In total—across the many therapies the child needs, including behavioral therapy, speech therapy, and occupational therapy—the family has paid between approximately $5,000–$7,000 a month out of pocket, which Anthem has not reimbursed. While behavioral therapy is partially reimbursed, speech and occupational therapy are paid nearly all out of pocket.

94.    In addition to these out-of-pocket payments, the Mazzolas pay $2,094 a month to Anthem for their health insurance premium.

95.    The Mazzolas relied on the Anthem website, provider listings, the Anthem Certificate of Insurance, Anthem's regular Explanation of Benefits, and interactions with

Anthem and Carelon representatives to understand their benefits and choose their health insurance plan.

96.     As a small company that provides health insurance to its employees, Plaintiff Amec had a choice of taking its business to another health insurance company.

97.     The plan Amec chose for its employees and their families was the Silver Pathway CT PPO plan. It was chosen based on Defendants' false representations (in contract and marketing materials) regarding the robust provider network.

98.     Up until 2025, the Anthem health insurance plan Amec offered was not covered by ERISA.

**E)     Improper Denials, Lack of Parity, and Unfulfilled Promises of Treatment**

99.     On December 2, 2024, Baby Doe was diagnosed with autism by Dr. Abha Gupta, MD, Ph.D., at the Yale Medicine Developmental and Behavioral Pediatric Program.

100.    On December 6, 2024, Lynn Hartigan, M.Ed., BCBA, LBA, and Jennifer Opotzner M.A., BCBA, LBA of the Center for Growth and Development prepared a 15-page Treatment Plan for Baby Doe, based on Dr. Gupta's diagnosis.

101.    On December 30, 2024, Anthem approved the treatment plan developed by Ms. Opotzner and Ms. Hartigan, and so informed both the Mazzolas and Ms. Opotzner.

102.    That December 30th approval also stated, "[r]eviewed for your plan by Carelon Behavioral Health, Inc."

103.    The approved plan specified that "a high quality, intensive ABA program be implemented which includes integration of related services (OT, PT, and Speech) and access to typical peers as well as parent training." Further, it provided that Baby Doe "requires a minimum of 40 hours per week of Applied Behavior Analytic services aimed at reducing maladaptive behaviors and developing language, social, and adaptive skills." Finally, it noted that "[c]lose

collaboration with [Baby Doe's] speech therapist is imperative to his success in developing communication skills."

104.    Even though it approved the plan on December 30, 2024, Anthem denied Baby Doe's occupational therapy – to be provided by Amanda O'Connor – on February 7, 2025, based on a finding that the therapy was not "medically necessary."

105.    This directly contradicted Anthem's earlier approval of the Opotzner plan which included OT therapies.

106.    The February 7, 2025, denial included a "tell" – the real reason Anthem was denying the occupational therapy to Baby Doe was to avoid the financial cost of the approved treatment plan: "This provider is not in-network for your plan."  The denial further stated, "Your plan network has providers with the same skills who are able to provide the requested service." That was a false and misleading statement.

107.    The Opotzner Treatment Plan, approved by Anthem on December 30, 2024, also specified speech therapy for Baby Doe.

108.    On February 7, 2025, Anthem denied Baby Doe's speech therapy with Aissa Inskeep as the provider.

109.    Again, Anthem stated, "[y]our plan does not cover care that's Not Medically Necessary."

110.    And again, Anthem included the statement, "This provider is not in-network for your plan."  The denial further stated, "[y]our plan network has providers with the same skills who are able to provide the requested service."

111.    This denial of coverage based on Anthem's stated determination that in-network providers were available was contrary to the terms of the plan because there were no available

in-network providers available within a reasonable distance of the Mazzolas. The denial of the Mazzolas' claim, refusal to approve out-of-network services as authorized services, and inconsistent and inadequate reimbursements violated the terms of the plan.

112.   This denial of coverage based on Anthem's stated determination that the care was "not medically necessary" was contrary to the terms of the plan and reflected a more restrictive treatment limitation than those applied to medical and surgical benefits covered by the plan.

113.   Over the same time period during which Defendants failed to supply in-network behavioral health providers within a reasonable distance of the Mazzolas' residence and denied the Mazzolas' claims for behavioral health treatment for Baby Doe, the Mazzolas identified in-network providers within 20 miles of their residence for orthopedic care, primary care, ophthalmology, podiatry, medical screenings, dermatology, and neurology; scheduled appointments and received treatment; and submitted claims which Defendants approved.

114.   For example, in or about April 2024, Michelle Mazzola searched for an orthopedist specializing in the treatment of hand injuries within 20 miles of her residence on Anthem's directory. Michelle Mazola was easily able to schedule an appointment with the first doctor she called. She received treatment at two appointments in April and May 2024, and her claims for coverage were accepted by Anthem.

115.   On or about April 18, 2025, Ms. Mazzola searched for urgent care providers on the Anthem directory within 20 miles of her residence. Ms. Mazzola was seen at the first provider that she selected from the directory, St. Vincent's Urgent Care, the same day. Her claim for coverage was accepted by Anthem.

116.    On or about June 30, 2025, Guy Mazzola was easily able to schedule an appointment with an ophthalmologist within 20 miles of his residence. He received treatment in July and August 2025. His claims for coverage were accepted by Anthem.

117.    On or about August 11, 2025, Guy Mazzola was easily able to schedule an appointment with a dermatologist within 20 miles of his residence. Mr. Mazzola was treated and his claim for coverage was accepted by Anthem.

118.    Mr. Mazzola also searched for providers on Anthem's directory for podiatry within 20 miles of his residence. Mr. Mazzola was easily able to schedule an appointment with the first doctor called. Mr. Mazzola was treated and his claim for coverage was accepted by Anthem.

119.    In or about August 2025, Michelle Mazzola scheduled medical screening at Stamford Health Medical Group, within 20 miles of her residence. Ms. Mazzola was screened and her claim for coverage was accepted by Anthem.

120.    On or about September 19, 2025, Michelle Mazzola scheduled medical screening at Stamford Health Medical Group, within 20 miles of her residence. Ms. Mazzola was screened and her claim for coverage was accepted by Anthem.

121.    In November 2025, Michelle Mazzola searched Anthem's provider directory for a neurologist within 20 miles of her residence. Ms. Mazzola was easily able to schedule an appointment with the first doctor she called.

122.    On information and belief, over the same period, other members of the class were able to identify in-network providers within a reasonable distance of their residences for analogous medical and surgical services, including physical therapy, orthopedics, pain management, psychiatry, neurology, cardiology, podiatry, dermatology, rheumatology,

gastroenterology, oncology, immunology, anesthesiology, and internal medicine and Defendants approved claims for these services.

123.    The Defendants' denials of the Mazzolas' claims for treatment for Baby Doe, refusal to approve out-of-network services as authorized services, and inconsistent and inadequate reimbursements reflect more restrictive financial requirements for behavioral health services than those applied to medical and surgical benefits covered by the plan.

124.    On June 5, 2025, NBC News broadcast a news story about the Mazzolas' difficulty finding in-network providers to treat Baby Doe. Part of the segment included the NBC News investigative reporter Vicky Ngyuen calling some of the same providers Ms. Mazzola had called. The on-air report included Ms. Ngyuen hearing providers say they did not accept the insurance, did not treat children or did not have new patient availabilities.

125.    One week after this broadcast, Anthem sent the Mazzolas a certified letter. It was the first time the Mazzolas ever received a certified letter from Anthem. The letter included the statement: "Reviewed for your plan by Carelon Behavioral Health, Inc."

126.    This letter stated that Anthem would no longer cover behavioral therapy it had previously approved in the Opotzner Treatment Plan because Ms. Opotzner was out-of-network and Anthem/Carelon had "found an in-network provider with availability who can provide services for your child, that provider is Krista Pomeroy, BCBA, Behavioral Analyst at Seed Autism."

127.    Immediately after receiving the certified letter from Anthem, Ms. Mazzola called the Seed center and spoke with Talonda Johnson, Seed's office manager.

128.    Ms. Johnson told Ms. Mazzola that there was no way that Anthem would know if Ms. Pomeroy had availability.

129.    Ms. Johnson then explained that, to receive care at Seed, Baby Doe would need to be evaluated again, the new provider would need to come up with a new treatment plan, and that plan would need to be approved by Anthem. Then, Baby Doe would be assigned to a provider if any were available. This process could take months.

130.    To double-check the Defendants' claims, the Center for Growth and Development – which provided Baby Doe's original approved Treatment Plan – called Seed. They were told that Seed was opening a second location, but that there was already a waitlist for services. They were also told that Seed did not provide speech therapy, occupational therapy, physical therapy, or integration with neurotypical peers, all of which were essential components of the approved Optozner Treatment Plan. Given the lack of an in-network provider available, Anthem's refusal to cover the agreed services in the Opotzner Treatment Plan violated the terms of the plan. The refusal to cover services also constituted an improper denial of benefits; a more restrictive treatment limitation than those applied to medical and surgical benefits covered by the plan; and a more restrictive financial requirement than those applied to medical and surgical benefits covered by the plan.

### F)    Anthem's Inconsistent Reimbursements and Inappropriate Application of Out-of-Pocket Costs to the Mazzolas' Deductible

131.    Anthem policy and procedures for reimbursing members for out-of-network services and for applying those out-of-pocket to a member's deductible is not just opaque, it is a moving target.

132.    Under the Mazzola's Anthem plan, they are allowed to utilize out-of-network providers. The price the Mazzolas are supposed to pay differs depending on whether there are qualified in-network providers available within a reasonable distance. If there are qualified providers, the reimbursement rate might be 50% of the provider's charge; or it might be some

amount pegged to the Medicare rate. As detailed below, the explanations provided to the Mazzolas (and other Plaintiffs) via the Certificate of Coverage and the Summary of Benefits differ.

133.    For example, on March 31, 2025, Anthem sent the Mazzolas a Health Care Summary. This summary included three claims by a provider for "Therapeutic Services" for Baby Doe on March 10th. Each charge was for $50. Anthem, however, with no explanation paid the provider $21.13 for the first claim, then increased the payment by $1.11 to $22.24 for the second, and then increased the third by another $1.11 for the third. The provider was The Center for Growth & Development.

134.    Although The Center for Growth & Development was out-of-network, Anthem knew that there were no in-network providers available to treat Baby Doe. Consequently, per the Certificate of Coverage, Anthem should have treated these providers as in-network, and not as out-of-network and the Mazzolas should have paid only a 20% co-insurance.

135.    The Mazzolas were told to buy an Augmentive Communications Device for Baby Doe (an iPad with special communications software that speaks for the child). But with no speech therapist available or approved, Anthem would not approve the expense and would not apply the over $1,000 expense to the Mazzola's deductible.

136.    Anthem provided no explanation as to the basis for these determinations. The Mazzolas' paid more than 50% of the cost of treatment and devices. Because there was no qualified in-network provider available, the reimbursement to the Mazzolas should have been higher.

137.    Anthem provided no explanation of how much of the Mazzolas' out-of-pocket expenditure was put towards their deductible.

138.    On May 7, 2025, Anthem sent the Mazzolas a Health Care Summary. This summary included three claims by a provider for "Therapeutic Services" for Baby Doe on March 31, 2025. The provider was Amanda O'Connor, who was out-of-network.

139.    Each of the three charges by the provider was for $35 and Anthem paid nothing towards any of these claims.

140.    Although Amanda O'Connor was out-of-network, Anthem knew that there were no in-network providers available to treat Baby Doe. Consequently, per the Certificate of Coverage, Anthem should have treated these providers as in-network rather than out-of-network and the Mazzolas should have paid only a 20% co-insurance.

141.    Anthem provided no explanation of how much of the Mazzolas' out-of-pocket expenditure was put towards their deductible.

142.    This denial of coverage for Baby Doe's behavioral health services was contrary to the terms of the plan and constituted a more restrictive treatment limitation than those applied to medical and surgical benefits covered by the plan.  All of Baby Doe's therapies are the result of his autism, a neurodevelopmental disorder that comes under the purview of the National Institute of Mental Health.[47]

143.    The requirement that the Mazzolas pay higher out-of-pocket costs and the reduced credit toward the Mazzolas deductible violated the terms of the plan and constituted more restrictive financial requirements than those applied to medical and surgical benefits covered by the plan.

---

[47] https://www.nimh.nih.gov/health/topics/autism-spectrum-disorders-asd

G)    **Secret Shopper Studies on Behalf of Plaintiff Baby Doe**

144.    In February 2025, Plaintiffs' counsel arranged for three secret shopper studies to replicate Ms. Mazzola's experience trying to secure behavioral health care for her then-21-month-old son, as she sought behavioral therapy, speech therapy, and occupational therapy for him. Overall, less than 30% of the listed providers could be reached, provided the listed services, or were willing to schedule an initial appointment.

145.    There were three separate secret shopper studies conducted: one for behavioral therapy, another for speech therapy, and a third for occupational therapy.

146.    Counsel's research consultant used Defendants' online directory to search for in-network providers within 10–20 miles of New Canaan, Connecticut—based on Ms. Mazzola's original search—depending on the secret shopper study. The consultant called all the names generated by Defendants' provider directory search tool, which yielded 105 providers in total: 54 behavioral therapy providers, 32 speech therapy providers, and 19 occupational therapy providers. The consultant made three attempts (over several days) to call each provider who did not pick up the phone.

147.    Out of the total 105 providers called—across behavioral therapy, speech therapy, and occupational therapy providers—appointments could not even be made with 75 of them.

148.    Out of the total 105 providers listed in Defendants' directory, 22 providers were unreachable. "Unreachable" was defined as a disconnected phone, an incorrect phone number, or three voicemail messages left with no return phone call.

**Secret Shopper Study 1: Behavioral Therapy**

149.    Counsel's consultant used Defendants' directory to search for behavioral therapy providers within 10 miles of New Canaan, Connecticut.

150.    Out of the 54 behavioral therapy providers called, appointments could not even be made with 39 of them.

151.    Of the 39 connected calls, 24 did not accept the insurance plan, were not accepting new patients, were not taking appointments within one month, and/or were not at the listed location.

152.    That is a 72 percent ghost rate for all the behavioral therapy provider calls.

153.    The defendants were on notice that the directory was inaccurate.

154.    This ghost rate reflects that a majority of provider listings were false. The incorporation of the listings into the plan marketing materials through references to the Defendants' network and covered services and the Defendants' public websites constituted a knowing false statement and representation of fact in connection with the marketing and sale of the plan.

**Secret Shopper Study 2: Speech Therapy**

155.    Counsel's consultant used Defendants' directory to search for speech therapy providers within 20 miles of New Canaan, Connecticut.

156.    Out of the 32 speech therapy providers called, appointments could not even be made with 21 of them.

157.    Of the 27 connected calls, 16 did not accept the insurance plan, offered the wrong type of service, and/or were not taking appointments within one month.

158.    That is a 66 percent ghost rate for all the speech therapy provider calls.

159.    This ghost rate reflects that a majority of provider listings were false. The incorporation of the listings into the plan marketing materials through references to the Defendants' network and covered services and the Defendants' public websites constituted a

knowing false statement and representation of fact in connection with the marketing and sale of the plan.

**Secret Shopper Study 3: Occupational Therapy**

160.    Counsel's consultant used Defendants' directory to search for occupational therapy providers within 10 miles of New Canaan, Connecticut.

161.    Out of the 19 occupational therapy providers called, appointments could not even be made with 15 of them. Two provider listings were unreachable.

162.    Of the 17 connected calls, 14 did not accept the insurance plan and/or offered the wrong type of service.

163.    That is an 80 percent ghost rate for all the occupational therapy provider calls.

164.    This ghost rate reflects that a majority of provider listings were false. The incorporation of the listings into the plan marketing materials through references to the Defendants' network and covered services and the Defendants' public websites constituted a knowing false statement and representation of fact in connection with the marketing and sale of the plan.

### H)    The Mazzolas' Experience with Anthem and Carelon

165.    As described throughout this complaint, Ms. Mazzola spent dozens of hours seeking medically necessary services for her child. Ms. Mazzola used the Anthem online directory multiple times; called – or tried to call – Anthem customer service representatives numerous times; used the Anthem online chat agent several times; and was called by Anthem or Carelon representatives multiple times. Ms. Mazzola also filed repeated claims for coverage for services for Baby Doe; Anthem denied those claims; Ms. Mazzola filed timely appeals; and the appeals were denied or improper amounts were applied to the Mazzolas' deductible.

Claims, Denials, & Exhaustion

166.     The Mazzolas' plan is the Anthem Silver Pathway CT PPO plan. Anthem provided a Certificate of Coverage for the Mazzola's plan. The Certificate of Coverage is the contract governing the plan.

167.     At page 34, the Certificate of Coverage provides a section on "Getting Approval for Benefits." This section explains that the "[p]lan includes the process of Utilization Review to decide when services are Medically Necessary or Experimental/Investigational as those terms are defined in this Booklet." The Certificate of Coverage further explains that for services to be covered, the services must be medically necessary and the enrollee must satisfy the following conditions: "You must be eligible for benefits; Premium must be paid for the time period that services are given; The service or supply must be a Covered Service under your Plan; The service cannot be subject to an Exclusion under your Plan; and You must not have exceeded any applicable limits under your Plan."

168.     At page 163, the Certificate of Coverage defines "Medically Necessary" as "health care services that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms." The Certificate of Coverage further requires that the services are "In accordance with generally accepted standards of medical practice; clinically appropriate, in terms of type, frequency, extent, site and duration and considered effective for the patient's illness, injury or disease; and not primarily for the convenience of the patient, physician or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."

169.    On page 163, the Certificate of Coverage defines "generally accepted standards of medical practice" as "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community or otherwise consistent with the standards set forth in policy issues involving clinical judgment."

170.    At pages 19-20, the Certificate of Coverage provides that benefits for speech therapy are limited to "[u]p to 40 visits for Rehabilitative services and up to 40 visits for Habilitative services per plan year." The Certificate of Coverage further provides that "[l]imits are combined for physical, speech, and occupational therapy."  The Certificate of Coverage provides the same limitations for benefits for physical and occupational therapy.

171.    Notably, at page 26, the Certificate of Coverage provides that "[t]he limits for Therapy Services (physical, occupational, and speech therapy) will not apply if you get that care as part of the Hospice benefit or the Menal Health and Substance Use Disorder benefit."

172.    At page 164, the Certificate of Coverage defines "Mental Health and Substance Use Disorder" as "[a] condition that is listed in the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) as a mental health or substance use disorder condition." Autism, under the terms Autistic disorder, Asperger's Syndrome, and Autism Spectrum Disorder, is and was listed in the Diagnostic and Statistical Manual of Mental Disorders as a mental health disorder at all relevant times.

173.    At page 111, The Certificate of Coverage provides that Anthem will process claims for coverage of services "within 60- days for paper claims and 20-days for electronic claims."

174.    At page 121, the Certificate of Coverage provides that any appeal of a denial of a claim or other adverse determination must be filed "within 180 calendar days from the date you

get a decision from us that you do not agree with." The Certificate of Coverage specifies that the enrollee or their doctor or any authorized representative can file an appeal in writing or by calling "Member Services at the phone number on your ID card."

175.    At page 124, the Certificate of Coverage provides that enrollees may seek external review of adverse coverage decisions. The Certificate of Coverage specifies, "[y]ou may file for external review with the Office of the Insurance Commissioner if a coverage decision involves making judgment as to the medical necessity appropriateness, health care setting, level of care or effectiveness of the health care service or treatment requested." The Certificate of Coverage requires that any external review request be filed within 120 days of the date of an adverse decision.

176.    At page 123, the Certificate of Coverage provides that standard appeals of adverse coverage determinations must be made in writing. The Certificate of Coverage further specifies that medical necessity determinations will be answered within thirty calendar days and all other standard appeals will be answered within twenty business days.

177.    At page 125, the Certificate of Coverage provides that "[n]o lawsuit or legal action of any kind related to a benefit decision may be filed by you in a court of law or in any other forum, unless it is commenced no earlier than 60 days after we receive the claim or other request for benefits and within one year of our final decision on the claim or other request for benefits."

178.    With respect to ERISA, at page 125, the Certificate of Coverage provides: "If your health benefit plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA), and you have exhausted all mandatory grievance rights, you have the right to bring a civil action in federal court under section 502(a)(1)(B) of ERISA."

179.     The Mazzolas have exhausted their Plan remedies through informal requests and formal process. The Mazzolas have directly appealed Defendants' denials of the Mazzolas' contested claims. Consistent with the terms of the Plan, the Mazzolas filed the instant action no earlier than 60 days after Defendants received the contested claims and within one year of Defendants' final decisions on the contested claims. The Mazzolas have exhausted the Plan's internal appeals process.

180.     Specifically, Baby Doe was referred for an intensive therapeutic program, including ABA, speech, physical, and occupational therapy, to support his functional communication, behavioral regulation, and adaptive function by a developmental pediatrician at Yale New Haven Health in or about December 2024. Baby Doe was referred for speech therapy five days per week. Baby Doe was referred for occupational therapy three days per week.

181.     A licensed clinical social worker also referred Baby Doe for the speech, occupational, and physical therapy in or about December 2024 as part of an Applied Behavioral Analysis.

182.     The Mazzolas searched for in-network providers on Anthem's directory but were unable to find any providers who provided speech and/or occupational therapy or were accepting new patients within 20 miles (roughly a 45-minute drive) of the Mazzolas' residence.

183.     The Mazzolas did find an out-of-network provider who was able to provide the speech and occupational therapy services within 20 miles of the Mazzolas' residence. Baby Doe has been seen for occupational and speech therapy at the out-of-network provider multiple times per week as recommended by the primary care pediatrician and licensed clinical social worker from January 2025 to present. The Mazzolas have been unable to find a provider within a reasonable distance who will provide physical therapy for Baby Doe.

184.    Anthem rejected the referral from the developmental pediatrician and the licensed clinical social worker and insisted that the referral for treatment be made by Baby Doe's primary care doctor. Baby Doe's primary care doctor issued a referral for the same therapies at the same frequencies on or about February 28, 2025.

185.    Every claim for coverage for Baby Doe's multiple-times-per-week speech therapy sessions from January 13, 2025, to July 10, 2025, was denied by Anthem. In issuing the denials, Anthem claimed that the speech therapy services were available in network. Ms. Mazzola appealed these denials by repeatedly submitting electronic appeals to Anthem throughout February and March 2025. Anthem determined that the denials of service were appropriate on appeal.

186.    On or about March 22, 2025, Ms. Mazzola sought external review of Anthem's adverse coverage determination. The external reviewer concluded that "in individuals with autism, communication, speech, and language-based interventions seek to improve core deficits in social and functional communication skills." The external reviewer also concluded that "the documentation provided for review clearly demonstrates ongoing speech therapy service needs to support the member's expressive and receptive language delays." The external reviewer noted, however, that "the intensity of speech therapy services 5 times per week is not consistent with accepted standards of practice." The reviewer concluded that, "the member clearly has needs for ongoing speech therapy services but at a more appropriate frequency." The external reviewer made a final determination that "speech therapy from an out-of-network provider is not medically necessary for treatment of the member's condition."

187.    Anthem persisted in its denial of the Mazzolas' claims for coverage of speech therapy for Baby Doe from January to July 2025, despite Baby Doe's clear and documented

medical necessity for speech therapy and despite reversing on appeal its denial of coverage for occupational therapy for Baby Doe from the same provider. Despite reversing its own decision on appeal and granting an out-of-network exception to the Mazzolas for the occupational therapy, it has not paid most of the Mazzolas' occupational therapy claims.

188.    Baby Doe's physical and occupational therapy was sought and provided as part of the Mental Health and Substance Use Disorder benefit.

189.    In or about September 2025, Baby Doe was seen for genetic testing. Anthem denied the claim for coverage after determining that the testing was not medically necessary. The Mazzolas appealed the denial in October 2025. The appeal was denied.

## II.    Plaintiff Lisa Kuller

190.    Plaintiff Lisa Kuller is a member of the Anthem Blue Cross Blue Shield Bronze PPO Pathway plan and has been a member since January 2025. She is a resident of Ridgefield, Connecticut.

191.    Ms. Kuller has dissociative disorder, which she has been dealing with for most of her life. It is a condition caused by complex trauma that leads her to dissociate from reality. Dissociative disorder is a serious condition, and she has been hospitalized for it in the past.

192.    Ms. Kuller obtained her insurance through Connecticut's Affordable Care Act marketplace, called Access Health CT.

193.    Prior to enrolling in her Anthem plan, she was enrolled in a ConnectiCare plan.

194.    Ms. Kuller frequently travels domestically and her previous plan only offered a geographically-limited regional network, so it was hard to reliably find care when she needed it during her travels.

195.    Ms. Kuller made the decision to enroll in her Anthem plan based on Anthem's representations that it offered one of the largest provider networks of physical and behavioral health providers in the United States.

196.    The size of an insurer's network was very important to her enrollment decision, and Ms. Kuller relied on Anthem's statements about the breadth of its network. These representations were critical to Ms. Kuller when she selected Anthem as her insurer on the marketplace.

197.    When deciding to enroll in coverage through Anthem, Ms. Kuller relied on implicit and explicit representations by Anthem that the provider directory was robust and accurate, especially with respect to mental health providers.

198.    When determining the best health insurance option for herself in late 2024, Ms. Kuller looked for insurance that offered robust mental health coverage, a nationwide provider network, and a network that included her primary care physician. She chose Anthem's Bronze PPO Pathway plan based on those criteria.

199.    Prior to enrolling in Anthem, Ms. Kuller confirmed that her primary care physician was in Anthem's network. She also conducted online research about the plan and came across Anthem's representations about the size and nationwide scope of its network.

200.    When making her enrollment decision, Ms. Kuller relied on representations she saw on the Anthem website about the size of Anthem's network for behavioral health. When conducting her research and prior to choosing her Anthem plan, Ms. Kuller used Anthem's online network directory to look at the list of behavioral health providers near her and noted that it included a significant number of in-network providers for her to choose from.

201.    Ms. Kuller is a therapist herself and keeps track of the networks and who is in her area for her own purposes and for referring patients.

202.    After she became an Anthem member, Ms. Kuller searched for therapists and psychiatrists within a 30-mile radius that treat dissociative disorder in the Anthem network. Only about 20 providers resulted. Many of those providers were no longer located where the Anthem network list said they were located or did not accept Ms. Kuller's insurance.

203.    Others that Ms. Kuller contacted could not provide the appropriate treatment for her condition. For instance, the list included reiki healers focused on aura and energy.

204.    Ms. Kuller reviewed 15 of approximately 20 providers that came up in response to her search of Anthem's network list and none of them were viable providers of treatment for her dissociative disorders.

205.    After she reached the fifteenth, she felt frustrated and abandoned her search, opting to seek out-of-network care instead.

206.    From January to September of 2025, Ms. Kuller saw an out-of-network therapist three times a week. The total cost per session was $250. Insurance covered $90 and Ms. Kuller paid $160.

207.    Then, in or about September 2025, Ms. Kuller decided to switch therapists and again searched the Anthem network directory to find someone in-network. Using the Anthem website, Ms. Kuller filtered for therapists within 15 miles of her that were accepting new patients and checked the "dissociative disorder" box under the list of conditions on the network's filter panel. Many of the same providers she saw before were still there, and she called several of them back. In total, she called between five and ten providers and again she could not find a therapist that met her criteria. The providers she called were either not actually in-network with Anthem,

not accepting new patients, or had no experience or expertise treating patients with complex trauma.

208.    One of the two providers Ms. Kuller called who was in-network and accepting new patients purported to be a psychic that specialized in past life regressions. This specialization did not suit Ms. Kuller's criteria for a therapist.

209.    Because she was again unable to find an in-network therapist, Ms. Kuller found another out-of-network therapist. She sees that therapist twice a week. The total cost per session is $250. Insurance covers $90 and Ms. Kuller pays $170.

210.    Ms. Kuller sees a psychiatrist once a month. The total cost per session is $375. Ms. Kuller's Anthem plan, based on Elevance's policy, reimburses $80 of that, and Ms. Kuller is responsible for the remaining $295 herself.

211.    Over the same time period during which Defendants failed to supply in-network mental health providers within a reasonable distance, causing Ms. Kuller to rely on out-of-network care and pay the majority of the cost of her treatment out of pocket, Ms. Kuller identified in-network providers within a reasonable distance for primary care, physical therapy, orthopedics, pain management, cardiology, rheumatology, and gastroenterology; scheduled appointments and received treatment; and submitted claims which Defendants approved.

212.    In or about January 2025, Ms. Kuller was looking for a gastroenterologist that specialized in C.Diff infections, which she experiences after taking antibiotics. She was looking for someone with extensive expertise in these infections, so she targeted her search around New Haven, since Yale University is the biggest and best teaching hospital in her region. After entering these parameters into the Anthem network directory, she reviewed the resulting providers and found one who was affiliated with Yale University and specialized in C.Diff. She

called his office and scheduled an appointment for the following week. In total, this search took her less than half an hour. She did not call, and did not need to call, any other providers.

213.    In the Spring of 2025, several months after switching from ConnectiCare to Anthem, Ms. Kuller was looking for an orthopedist since the orthopedist she had seen before was not in Anthem's network. Ms. Kuller used the Anthem online network directory to search for an orthopedist within fifteen miles of her home. Her search generated a number of options, and she called one of them who had impressive educational credentials. She called that doctor's office and got an appointment right away. After coming in for an initial consultation, Ms. Kuller had a tendon procedure performed. In total, this search took her approximately fifteen minutes. She did not call, and did not need to call, any other providers.

214.    Ms. Kuller has also seen an in-network rheumatologist and an in-network knee specialist who were referred by her primary care physician. She had no trouble getting an appointment with either provider, and both were within fifteen miles from her home.

215.    On information and belief, other enrollees were able to identify in-network providers within a reasonable distance for analogous medical and surgical services, including, but not limited to, primary care, physical therapy, orthopedics, pain management, psychiatry, neurology, cardiology, podiatry, dermatology, rheumatology, gastroenterology, oncology, immunology, anesthesiology, and internal medicine and Defendants approved claims for these services.

**A)    Secret Shopper Study on Behalf of Plaintiff Lisa Kuller**

216.    In June 2025, Plaintiff's counsel arranged with an experienced and qualified consultant to conduct two secret shopper studies that attempted to replicate Ms. Kuller's experience when she sought mental health care.

217.    For the first secret shopper study, Counsel's consultant used Defendant's online directory to search for an in-network psychologist or therapist who was accepting new patients within 20 miles of Ridgefield, Connecticut. From 208 names generated by Defendant's provider directory search tool, Counsel's consultant called the first 100 names. Counsel's consultant made at least two attempts (over three days) to call each provider. Counsel's consultant was unable to make an appointment with 63 of the 100 listed providers. That is a 63 percent ghost rate for all calls.

218.    For the second secret shopper study, Counsel's consultant used Defendant's online directory to search for an in-network provider specializing in dissociative disorder within 20 miles of Ridgefield, Connecticut. Counsel's consultant called the 23 names that resulted. Counsel's consultant made at least two attempts (over three days) to call each provider. Counsel's consultant was unable to make an appointment with 18 of the 23 listed providers. That is a 78 percent ghost rate for all calls.

## III.    Elevance Owns and Controls Anthem and Carelon

219.    Elevance is a healthcare company and the sole owner of both Anthem and Carelon.

220.    Elevance Health, Inc. was called Anthem, Inc. until 2022 when the parent company rebranded and changed its name to Elevance Health Inc.[48]

221.    Elevance Health Inc. uses Anthem Health Plans, Inc. to administer Elevance's health insurance products and interface with healthcare consumers and providers about those insurance products.

---

[48] *Anthem, Inc. Shareholders Approve Corporate Rebranding to New Name, Elevance Health, Inc.*, Press Release (May 18, 2022), https://www.elevancehealth.com/newsroom/anthem-inc-shareholders-approve-corporate-rebranding-new-name.

222.    Elevance Health Inc. uses Carelon Behavioral Health Inc. to administer Elevance's behavioral health services.

223.    Upon information and belief, Elevance Health Inc. sets key policies, oversees, and controls the operations of Anthem Health, Inc.

224.    Upon information and belief, Elevance Health Inc. sets key policies, oversees and controls the operations of Carelon Behavioral Health Inc.

225.    Upon information and belief, the more consumers enroll in Anthem's health insurance, pay premiums and other costs for that health insurance, and do not use or receive the full health insurance benefits they are owed, the higher Anthem's profits.  Upon information and belief, Anthem passes on a portion of its profits to Elevance and Carelon; thus, the more Anthem profits, the more Elevance and Carelon profit.  Accordingly, Anthem, Elevance, and Carelon all benefit financially when consumers, including Plaintiffs, enroll in Anthem's health insurance, pay premiums and other costs for that health insurance, and do not use or receive the full health insurance benefits they are owed.

226.    In its Form 10-K submitted to the U.S. Securities and Exchange Commission in 2024, Elevance described its corporate structure as follows: "Anthem Blue Cross/Anthem Blue Cross and Blue Shield — represents our Anthem-branded and affiliated Blue Cross and/or Blue Shield licensed plans . . . Carelon — this brand brings together our healthcare related services and capabilities, including our CarelonRx and Carelon Services businesses, under a single brand name." The document continued: "In a majority of these service areas, we do business as Anthem Blue Cross and Anthem Blue Cross and Blue Shield."[49]

---

[49] Elevance Health, *Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934* (Feb. 20, 2025), *available at*
https://s202.q4cdn.com/665319960/files/doc_financials/2025/ar/Elevance-Health-2024-10K-
(continued…)

227.    In its Form 10-Q for the quarterly period that ended on September 30, 2025, Elevance stated: "Our Carelon Services segment integrates physical, behavioral, pharmacy, and social services with the aim of delivering whole health affordably by offering a broad array of healthcare related services and capabilities to internal and external customers through our Carelon Health and Carelon Insights businesses."[50]

228.    Plaintiffs have contracted with Anthem Health Inc. for the provision of their insurance plans, but regularly receive support and communications from Carelon Behavioral Health Inc. about their plan benefits.

229.    For instance, Ms. Mazzola was directed to an autism case manager from Carelon when she contacted the member services number on the back of her insurance card.

230.    The first case manager she was assigned, Geneva Kacher, called Ms. Mazzola on or about January 2, 2025 and said she was calling from Anthem. But her follow-up by secure email was sent on Carelon letterhead and using an @carelon.com email address.

231.    Melinda Hommel, the second autism case manager assigned to Ms. Mazzola, affirmed to Ms. Mazzola on May 30, 2025 via email that "Carelon Behavioral Health serves as the behavioral health clinical and network lead for Anthem Blue Cross and Blue Shield in Connecticut and assists Anthem members with mental health benefits." Ms. Hommel's email also noted that both companies were subsidiaries of Elevance Health.

232.    On or around May 29, 2025, Ms. Mazzola was engaged in a live chat conversation with an agent through the Anthem website after receiving a call from Carelon

---

color.pdf.

[50] Elevance Health, *Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934* (Oct. 21, 2025), *available at* https://s202.q4cdn.com/665319960/files/doc_financials/2025/q3/3Q2025ELV10Q.pdf.

where they followed up on Ms. Mazzola's request for care and had information about Ms. Mazzola's son's medical history and needs. Ms. Mazzola asked the agent what the relationship was between Carelon and Anthem and how they had her son's medical information without her signing a release pursuant to the Health Insurance Portability and Accountability Act (HIPAA).

233.    The agent confirmed that "Carelon Behavioral Health (CBH) is connected to Anthem in that . . . Anthem behavioral health providers' agreements will be moved over to Carelon Behavioral Health . . .  Carelon will also intake all provider records from Anthem and load the information into their system, and . . . Carelon is consolidating contracts for in-scope providers who belong to both the Anthem and Carelon networks into a single provider contract, enabling them to service both members of Carelon and Anthem."

234.    Ms. Mazzola again sought to clarify the relationship between the two companies, responding: "I don't understand. I have anthem Blue Cross Blue Shield insurance of Connecticut. None of my documentation says anything about carelon I never authorize[d] anthem to disclose any information to carelon. Is Carelon owned by anthem."

235.    The agent responded: "Yes, Carelon operates as a subsidiary of Elevance Health, previously called Anthem, Inc."

## IV.    The Anthem Plan and Behavioral Health Coverage

### A)    Anthem's Advertising and Marketing Statements

236.    Anthem's website advertises that Anthem offers the "largest networks: locally, nationally, and online."[51]

---

[51] *Grow your Business with Anthem*, Anthem Website, https://www.anthem.com/producer/products (last visited Jul. 1, 2025).

237.    Anthem's website further states, "Most people don't view their physical and mental health as separate, and neither do we. Behavioral health benefits are integrated into Anthem medical plans for a full spectrum of coordinated care for our members."[52]

238.    The small business portion of the Anthem website boasted, "Anthem features one of the broadest networks in the nation. As a Blue Cross Blue Shield card holder, your employees will have access to a network that includes 95% of doctors and 96% of hospitals in the U.S. One in three Americans carries a BCBS card — over 106 million members. (bcbs.com)."[53]

239.    Anthem further stressed the importance of mental health in its efforts to convince small businesses to choose Anthem because its plans were attuned to individual and business needs. Anthem stated:

> Your small business may be facing a new set of challenges due to the COVID-19 pandemic. Small business employees have reported that poor mental health undercut their job performance during the pandemic:
>
> > 65% felt mental health impacted ability to work
> > 40% battled burnout
> > 38% considering career change due to high stress
>
> This means that small business owners must take a proactive approach by helping employees feel safe, heard, and valued. Partnering with Anthem and prioritizing behavioral health helps keep employees engaged and increases productivity, which is just good business."[54]

---

[52] *Behavioral Health Provider Resources*, Anthem Website, https://www.anthem.com/ct/provider/individual-commercial/behavioral-health (last visited Jul. 1, 2025).

[53] *Small Business Health Insurance In Connecticut*, Anthem Website, https://www.anthem.com/ct/employer/small-business-health-insurance (last visited Jul. 1, 2025).

[54] *Small Business Behavioral Health*, Anthem Website, https://www.anthem.com/employer/small-business-health-insurance/behavioral-health (last visited Jul. 1, 2025).

240.    Defendants' representations weren't limited to their own contract and marketing materials. Anthem provided its logo and content to various insurance brokers. Its representations included, among other statements, an Anthem section on a broker brochure stating that "Members have access to a vast network of primary care physicians and specialists—92 percent of which are on the BlueCare HMO and POS network."[55]

241.    Anthem made a specific promise to small businesses:

> Backed by the power of the Blues network, our behavioral health network is one of the largest — and expanding as we continue adding Carelon Behavioral Health providers. 4 in 5 people living in Anthem markets have access to a behavioral health specialist within 20 minutes of where they live or work.[56]

**B)    Anthem's Plan Documents**

242.    The Summary of Benefits and Coverage ("SBC") provided to the Mazzolas describes their plan's mental and behavioral health benefits. It states:

| Common Medical Event | Services You May Need | What You Will Pay | | Limitations, Exceptions, & Other Important Information |
|---|---|---|---|---|
| | | In-Network Provider (You will pay the least) | Non-Network Provider (You will pay the most) | |
| If you need mental health, behavioral health, or substance abuse services | Outpatient services | Office Visit $50/visit Other Outpatient 20% coinsurance | Office Visit 50% coinsurance Other Outpatient 50% coinsurance | Office Visit Virtual visits (Telehealth) benefits available. Other Outpatient --------none-------- |
| | Inpatient services | 20% coinsurance | 50% coinsurance | --------none-------- |

243.    The SBC provided to Ms. Kuller describes her plan's mental and behavioral health benefits in identical fashion except it does not offer $50/visit for in-network providers.

---

[55] *Blue Cross Blue Shield Connecticut*, Health Markets, https://www.healthmarkets.com/company/blue-cross-blue-shield-connecticut/ (last visited Jul. 1, 2025).

[56] *Behavioral Health Provider Collaboration*, Anthem Website, https://www.anthem.com/ct/provider/individual-commercial/behavioral-health/collaboration (last visited Jul. 1, 2025).

| Common Medical Event | Services You May Need | What You Will Pay | | Limitations, Exceptions, & Other Important Information |
|---|---|---|---|---|
| | | In-Network Provider (You will pay the least) | Non-Network Provider (You will pay the most) | |
| If you need mental health, behavioral health, or substance abuse services | Outpatient services | Office Visit 20% coinsurance Other Outpatient 20% coinsurance | Office Visit 50% coinsurance Other Outpatient 50% coinsurance | Office Visit Virtual visits (Telehealth) benefits available. Other Outpatient --------none-------- |
| | Inpatient services | 20% coinsurance | 50% coinsurance | --------none-------- |

244.    There are some 60 references to mental health coverage in the Mazzolas' Certificate of Coverage and over 25 in Ms. Kuller's Subscriber Agreement.

245.    The Mazzolas' Certificate of Coverage—which forms part of the contract governing their health insurance—includes the rights and benefits afforded to members, including Plaintiffs. Page numbers refer to the page numbers in the Certificate of Coverage.

246.    The Mazzolas' Certificate states: "If you need to see a Specialist, you can visit any In-Network Specialist including a behavioral health Provider. You do not have to get a referral." Certificate of Coverage at 30.

247.    Citing the federal MHPAEA, the Mazzolas' Certificate further states:

> In general, group health plans offering mental health and substance use disorder benefits cannot set day/visit limits on mental health or substance use disorder benefits that are lower than any such day or visit limits for medical and surgical benefits. A plan that does not impose day or visit limits on medical and surgical benefits may not impose such day or visit limits on mental health and substance use disorder benefits offered under the Plan. Also, the Plan may not impose Deductibles, Copayments, Coinsurance, and out-of-pocket expenses on mental health and substance use disorder benefits that are more restrictive than Deductibles, Copayments, Coinsurance and out-of-pocket expenses applicable to other medical and surgical benefits. Medical Necessity criteria are available upon request.

*Id.* at 2.

248.    Autism services are covered by the plan, and the Mazzolas' Certificate states:

> Coverage shall be provided for the Medically Necessary diagnosis and treatment of Autism Spectrum Disorders (ASDs) based on an approved treatment plan. Your treatment plan will be reviewed not

more than once every six months unless your licensed Physician, licensed psychologist or licensed clinical social worker agrees that a more frequent review is necessary or as a result of changes in your treatment plan.

Covered Services include:

- Behavior Therapy rendered by an Autism Behavioral Therapy Provider and ordered by a licensed physician, psychologist or clinical social worker in accordance with a treatment plan developed by a licensed Physician, psychologist or licensed clinical social worker;
- Prescription drugs prescribed by a licensed Physician, advanced practiced registered nurse, or licensed physician assistant for the treatment of symptoms and co-morbidities of autism spectrum disorders;
- Direct psychiatric or consultative services provided by a licensed psychiatrist or psychologist;
- Occupational, Physical, and Speech therapy provided by a licensed therapist.

There is no coverage for special education and related services, except as described above.

*Id.* at 71.

249.    In addition, the Mazzolas' Certificate states: "We are required to confirm the list of In-Network Providers in our Provider Directory every 90 days. *Id.* at 32.

250.    The Mazzolas' Certificate is replete with promises regarding the completeness and adequacy of Anthem's provider directory.  It repeatedly advises insureds like the Mazzolas "How to Find a Provider in the Network."  It states that "you can find out if a Provider or Facility is in the network for this Plan" and "also find out where they are located and details about their license or training" by using "your Plan's directory of In-Network Providers at www.anthem.com, which lists the Doctors, Providers, and Facilities that participate in this Plan's network."  It goes on to explain: "This directory is an interactive tool that helps you locate Providers based on Provider type, specialty, and location. It will also identify if it is a Site-of-

Service Provider." It also states that "on Anthem's website," "You may … obtain … A listing / directory of all In-Network Providers."

251. The Mazzolas' Certificate explicitly requires Anthem to comply with all applicable federal and state laws, which would include laws pertaining to network adequacy and provider directory accuracy.

252. Other types of treatment for Baby Doe's condition are covered by the plan and explained in the Mazzolas' Certificate. The Mazzolas' Certificate provides that, for outpatient, the insurance policy covers speech therapy for "[u]p to 40 visits for Rehabilitative services and up to 40 visits for Habilitative services per plan per year." *Id.* at 19. The Mazzolas' Certificate promises the same coverage for physical and occupational therapy but provides: "[l]imits are combined for physical, speech, and occupational therapy." *Id.*

253. The Mazzolas' Certificate also provides that "[c]overage is available for up to 2 mental health wellness examinations per Benefit Period when performed by a licensed mental health professional or Primary Care Physician / Provider (PCP). No Cost-Share after Deductible is met will apply to the two visits and Prior Authorization is not required." *Id.* at 26.

254. Finally, the Mazzolas' Certificate provides for "habilitative health" benefits, examples of which "include therapy for a child who isn't walking or talking at the expected age." *Id.* at 54. It continues: "[t]hese services may include physical and occupational therapy, speech-language pathology and other services for people with disabilities in a variety of inpatient and/our outpatient settings." *Id.*

255. Exactly where members should turn to find medical care for an autistic child is not clear. It is not clear whether members should seek care from medical doctors or therapists, or

whether they should contact Anthem or Carelon. It is likewise unclear how much a family will have to pay if they use an out-of-network provider.

256.    Ms. Kuller's Subscriber Agreement—which is a contract governing her health insurance —is replete with promises regarding the completeness and adequacy of Anthem's provider directory.  It repeatedly advises insureds like Ms. Kuller that they can "find out if a Provider or Facility is in the Network for this Plan" as well as "where they are located and details about their license or training" by using "Your Plan's directory of In-Network Providers at www.anthem.com, which lists the Doctors, Providers, and Facilities that participate in the Plan's Network."  It also states that "on Anthem's website," "You may … obtain … A listing/directory of In-Network Providers."  Further, it states that "You may find out whether a Provider is taking part in certain programs by checking Your on-line Provider Directory."  And it urges insureds to "refer to Your directory for a listing of Participating Providers and Hospitals where Covered Services may be obtained."

257.    Ms. Kuller's Subscriber Agreement mandates that "Anthem is required to confirm the list of In-Network Providers in its Provider Directory every 90 days."

258.    Ms. Kuller's Subscriber Agreement explicitly requires Anthem to comply with all applicable federal and state laws, which would include laws pertaining to network adequacy and provider directory accuracy.

259.    Ms. Kuller's Subscriber Agreement incentivizes insureds to see in-network, rather than out-of-network, providers.  Anthem covers a larger percentage of an insured's costs, and imposes a lower deductible, for services provided by an in-network provider.

260.    Ms. Kuller's Subscriber Agreement covers various mental health services, including outpatient office visits, therapy, and intensive outpatient programs, in a variety of

clinical settings.  Anthem permits insureds to obtain covered services from psychiatrists, psychologists, licensed clinical social workers, licensed professional counselors, and others.

261.    Amec also has a contractual relationship with Defendants.  Amec entered into a contract with Anthem to provide health insurance coverage to its employees the past few years.  The contract requires Anthem to comply with the terms and conditions set forth (i) in the insurance materials provided to employees (including the Certificate of Coverage and Subscriber Agreement) and (ii) on Anthem's website (www.anthem.com).  These terms and conditions include those described above regarding Defendants' provider directory and compliance with applicable federal and state laws.

### C)    Out-of-Network Reimbursement

262.    If a member uses an out-of-network provider, the Mazzolas' Certificate of Coverage states:

> For Covered Services You receive from an Out-of-Network Provider, the Maximum Allowed Amount will be one of the following as determined by us:
>
> 1. An amount based on our managed care fee schedules used with In-Network Providers, which we reserve the right to modify from time to time; or
>
> 2. An amount based on reimbursement or cost information from the Centers for Medicare and Medicaid Services ("CMS"). When basing the Maximum Allowed amount upon the level or method of reimbursement used by CMS, Anthem will update such information, which is unadjusted for geographic locality, no less than annually; or
>
> 3. An amount based on information provided by a third party vendor, which may reflect one or more of the following factors: (1) the complexity or severity of treatment; (2) level of skill and experience required for the treatment; or (3) comparable Providers' fees and costs to deliver care, or
>
> 4. An amount negotiated by us or a third party vendor, which has been agreed to by the Provider. This may include rates for services coordinated through case management, or
>
> 5. An amount based on or derived from the total charges billed by the Out-of-Network Provider.

Certificate of Coverage at 106.

263.    The Mazzolas' SBC, however, states that a member's out-of-pocket cost when using an out-of-network provider would be "50% coinsurance."

264.    If a member uses an out-of-network provider, Ms. Kuller's Subscriber Agreement states:

> Except for Surprise Billing Claims, We will calculate the Maximum Allowed Amount for Covered Services You receive from an Out-of-Network Provider, using one of the following:
>
> 1. An amount based on Our Out-of-Network Provider fee schedule/rate, which We have established in Our discretion, and which We reserve the right to modify from time to time, after considering 1 or more of the following: reimbursement amounts accepted by like/similar Providers contracted with Us, reimbursement amounts paid by the Centers for Medicare and Medicaid Services for the same services or supplies, and other industry cost, reimbursement and utilization data; or
>
> 2. An amount based on reimbursement or cost information from the Centers for Medicare and Medicaid Services ("CMS"). When basing the Maximum Allowed amount upon the level or method of reimbursement used by CMS, Anthem will update such information, which is adjusted or unadjusted for geographic locality, no less than annually; or
>
> 3. An amount based on information provided by a third party vendor, which may reflect 1 or more of the following factors: (1) the complexity or severity of treatment; (2) level of skill and experience required for the treatment; or (3) comparable Providers' fees and costs to deliver care; or
>
> 4. An amount negotiated by Us or a third party vendor which has been agreed to by the Provider. This may include rates for services coordinated through case management; or
>
> 5. An amount based on or derived from the total charges billed by the Out-of-Network Provider; or
>
> 6. An amount based on the Medicaid fee schedule established by the State. When basing the Maximum Allowed Amount upon the level or method of reimbursement established by the State for Medicaid, Anthem will update such information no less than annually.

Subscriber Agreement at 86.

265.    According to the Mazzolas' Anthem plan, "If there is no In-Network Provider who is qualified to perform the treatment You require, contact Us prior to receiving the service or treatment, and We may approve an Out-of-Network Provider for that service as an Authorized Service." Certificate of Coverage at 32.

266.    Ms. Kuller's SBC, like the Mazzolas', states that a member's out-of-pocket cost when using an out-of-network provider would be "50% coinsurance." Summary of Benefits at 3.

267.    Members, like Plaintiffs, have no idea what their reimbursement will be if they use – or are forced to use – out-of-network providers.

268.    In reality, what Anthem reimburses members when they use an out-of-network provider is a small fraction of what members are being forced to spend to get care.

269.    FairHealth is an unrelated, highly respected, non-profit resource that provides consumers with extensive, accurate information about the cost of healthcare procedures. FairHealth is not a definitive price guide, but it does provide some guidance on how much a member might pay.

270.    One example: on February 24, 2025, Baby Doe saw an occupational therapist named Amanda O'Connor. Ms. O'Connor is an out-of-network provider and charged $300 for the session. Anthem said the allowed amount for this therapy was $55.83. Anthem paid Ms. O'Connor $5.83. The Mazzolas were responsible for a $50 co-pay, and the remaining balance which Anthem determined were "services not covered." In total, Anthem concluded that the Mazzolas' total cost was $294.37 for the visit.

271.    According to Fairhealth, the out-of-network reimbursement for the service, a moderate complexity occupational therapy evaluation, should have resulted in a cost to the Mazzolas of approximately $83.

V.    **Defendants' Fraudulent Ghost Network**

A)    **Anthem's Provider Directory**

272.    A majority of the behavioral health provider listings contained in the Anthem directory are, and have long been, intentionally inaccurate.

273.    Anthem has affirmatively told its members that its behavioral health network "connects you to the right behavioral health coverage products and strategy for promoting mental health at work and beyond."[57] Anthem also claims that its "behavioral health network is one of the largest —and expanding as [it] continue[s] adding Carelon Behavioral Health providers."[58]

274.    In its plan documents, Anthem repeatedly directs members to its online directory of in-network providers.[59]

275.    At all relevant times, Anthem published an online directory of providers who supposedly are in-network. This directory is publicly available to members and non-members of the Anthem plan.

276.   The directory contains information about, and can be sorted and searched based on, among other things, whether the provider is accepting new patients, the provider's location, qualifications, services offered, area(s) of expertise, medical specialty, office hours, patient age and gender preference, and availability for virtual visits and in-person care.

277.    This directory, for members and potential members, is the definitive resource to identify which providers are in-network and are thereby covered as an in-network provider. This

---

[57] *Small Business Behavioral Health*, Anthem Website, *supra* n. 54.

[58] *Id.*

[59] *See* Mazzolas' Certificate of Coverage at 29, 31, 32; Kuller's Schedule of Benefits at 10, 20, 27, 32.

directory forms a critical component of the contract governing the plan in which Plaintiffs are enrolled.[60]

278.    Anthem's directory of behavioral health providers is a ghost network to a staggering extent. The directory affirmatively misrepresents to current and prospective members that the behavioral health providers listed are in fact in-network and will be accessible and available to provide care. Instead, the vast majority of providers listed in the directory are not in-network, not available, not qualified to provide the services listed for them, and/or not actually practicing at the listed location.

279.   Moreover, the directory is replete with other important errors, including incorrect contact information and repeated entries of the same provider. These errors may appear at first glance to be minor, but they are far from trivial for a person who needs urgent mental health care for themself or a loved one. The erroneous inclusion of such information artificially inflates the perceived size and adequacy of Defendants' network and forces Plaintiffs to invest more time and energy trying to find a behavioral health provider—only to be repeatedly led down a dead end.

280.    In summary, Anthem's provider directory includes scores of providers who, contrary to what the directory says, are not in-network, do not exist, do not provide the type of care for which they are listed, and/or do not accept new patients. Moreover, the directory is replete with other critical errors, including, but not limited to, incorrect addresses, phone numbers, and other contact information, as well as repeat entries.

281.    These extensive errors render the provider directory grossly inaccurate. In their marketing materials, plan documents, and member contracts, Defendants' cite and incorporate by

---

[60] *Id.*

reference this grossly inaccurate directory. The directory makes it appear as if Defendants' network is far more robust than it actually is and falsely represents that plan members have access to vastly more mental health providers than they actually do. Accordingly, Defendants' provider directory, and representations about its comprehensive mental health coverage, are inaccurate, deceptive, and misleading.

###    B)    Anthem's and Carelon's Representations

282.    In addition to publishing and maintaining an intentionally inaccurate provider directory, Anthem provides consumers with deceptive and misleading marketing materials about the Anthem plan. These materials promise mental health benefits and a robust network of in-network providers.

283.    But it is not Anthem's misrepresentations alone that are relevant here: Carelon too makes numerous material misrepresentations. And Carelon is virtually indistinguishable from Anthem in its interactions with members like Plaintiffs.

284.    Carelon's website also stated that, "By improving access to care, behavioral health and wellness concerns can be addressed before they become significant conditions." The website further stated that "Carelon Behavioral Care serves as a clinical support system that provides appropriate and timely access to the care people need."[61]

285.    However, these statements are misrepresentations and misleading because consumers spend a great deal of time searching for in-network behavioral health providers to no avail.

---

[61] Behavioral Health Home Page, Carelon Website, https://web.archive.org/web/20250221082017/https://www.carelonbehavioralhealth.com/solutions/carelon-behavioral-care (captured on Feb. 21, 2025).

286.    These statements are inaccurate and misleading because neither Carelon nor Anthem has a large provider network on which consumers can rely, and consumers are left struggling and wasting time searching for treatment long after they start to seek out a behavioral health professional.

287.    Further, Carelon represented that consumers could rely on a "broad network of licensed clinicians [who are] available to fill gaps by providing access to care with comprehensive and vital resources."[62] That is inaccurate and misleading, as consumers often must turn to out-of-network providers because the Carelon network lacks adequate providers.

288.    Similarly, Carelon's Provider Handbook (last updated March 1, 2023), states that "Carelon arranges for the provision of and access to a ***broad scope of behavioral health services*** for members through its provider networks, ***consisting of appropriately licensed and/or certified practitioners, facilities, providers, and programs*** offering varying levels of service."[63] However, Carelon misleads consumers by making them believe that they will have access to a "broad scope" of service and appropriately licensed practitioners, when, in reality, Carelon's director is inaccurate and its network is sparse.

289.    Moreover, Carelon's "Provider Search" states that "Carelon makes every effort to maintain accurate and up-to-date information."[64] This statement is inaccurate and misleading

---

[62] *Our Solutions*, Carelon Website, https://web.archive.org/web/20250221172409/https://www.carelonbehavioralhealth.com/solutions (captured on Feb. 21, 2025).

[63] Carelon, Carelon Behavioral Health Provider Handbook, 10, (last updated Mar. 1, 2023), https://www.carelonbehavioralhealth.com/content/dam/digital/carelon/pdf/Carelon Behavioral Health Provider Handbook.pdf (emphasis added).

[64] Carelon, Provider Search.

because Carelon's provider directory is intentionally and grossly inaccurate and consumers are left wasting time and effort in their search for help.

290.    In reality, it is very difficult to obtain in-network behavioral health care, and consumers who relied on Carelon's and Anthem's misrepresentations are left to suffer the consequences of untreated mental illness, incur significant costs to afford out-of-network treatment, and pay premiums for benefits that are illusory.

291.    In conclusion, separately and together, Carelon's and Anthem's representations mislead consumers to believe that their behavioral health needs would be taken care of, that Carelon's and Anthem's in-network coverage is comprehensive, and that consumers can rely on the provider network to find necessary behavioral health care.

292.    Moreover, Carelon's and Anthem's repeated focus on the importance of using an in-network provider, and repeated direction to members to use the provider directory to find an in-network provider, underscores the importance of the provider directory to consumers.

293.    Finally, Defendants' attempts to have members themselves verify that a provider is in fact in-network do not replace, or otherwise absolve, Defendants' obligations to accurately represent the behavioral health providers available in the network.

**C)    Defendants' Omissions**

294.    In addition to the affirmative misrepresentations made by Anthem about the breadth of its provider network and comprehensiveness of its behavioral health care coverage, Anthem also makes material omissions, including but not limited to failing to disclose the extent of provider directory inaccuracies; that the vast majority of in-network behavioral health providers are not accessible; and the limitations of Anthem's behavioral health coverage.

295.    Specifically, Anthem omits any mention that members will likely face significant difficulty in finding an in-network behavioral health provider through the directory, or the

likelihood that members will need to either resort to an out-of-network provider or delay or potentially forgo care altogether.

296.    Significantly, there is an asymmetry of information between Anthem and consumers: Anthem can access all the relevant information to determine whether a provider is accurately listed.[65] On the other hand, only after great difficulty and time expenditure—through trial and error, hours of calls, and extensive research (which is especially difficult for those with behavioral health problems)—could a member become aware of the extent of the directory inaccuracies. The information is simply not readily available to the average consumer.

297.    Plaintiffs and other consumers must rely on Anthem to accurately represent which providers are in-network for their insurance plan. Anthem is well aware of the inaccuracies in their directory (indeed, the inaccuracies are intentional), yet consumers would have no reason to think that the list of providers represented as being in their insurance plan's network would not be accurate.

298.    If the directory inaccuracies and the inadequacies of Anthem's behavioral health care coverage were disclosed to Plaintiffs, they would have acted differently in a variety of ways, including, but not limited to, avoiding hours of fruitless searches and calls, saving and budgeting to prepare for out-of-network behavioral health care costs, and pursuing other health plan options.

299.    Anthem intentionally maintains an inaccurate and inflated provider directory to hide their non-compliance with network adequacy standards and to entice consumers to enroll in their plan based on false pretenses. In short, Anthem is defrauding its members and the public for

---

[65] This information includes their contracts and communications with providers, as well as billing information from which Defendants could easily ascertain the providers currently in their network.

financial gain. If Anthem produced an accurate provider directory, it would reflect that Anthem does not maintain sufficient in-network behavioral health providers, in violation of Connecticut network adequacy laws. And it would cause countless consumers to not enroll in Anthem health insurance.

300.    Anthem also fails to make clear to members that if an in-network provider is not available, then members may be able to use an out-of-network provider but still pay the in-network cost. This information is not included in either the SOB or the SBC and is buried in the small print in the back of the Certificate of Coverage.

## VI.    Anthem's Deceptive Representations and Omissions Are Material

301.    Consumers, including Plaintiffs, look to the breadth of a provider network in choosing a health plan.[66] Over half of consumers in one poll identified provider choice as the most important non-financial consideration they make when selecting a health plan.[67] In another survey, participants "were willing to pay $72 for a plan that covered 30% more doctors in their area[.]"[68] And, in a Kaiser Family Foundation survey, 60% of non-group health insurance enrollees reported that having a choice of providers was either "very important" or "extremely important" to them.[69]

---

[66] *See* Statista, *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016*, https://www.statista.com/statistics/654828/most-important-considerations-for-choosing-health-insurance-plan/.

[67] *See* Linda J. Blumberg et al., *Factors Influencing Health Plan Choice among the Marketplace Target Population on the Eve of the Health Reform*, Urban Inst., 2 (Feb. 6, 2014), https://www.urban.org/sites/default/files/2024-05/hrms_decision_factors.pdf.

[68] Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (July 2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment.

[69] Liz Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family

(continued…)

302.    Given how important provider networks are to consumers, consumers—including Plaintiffs and members of the proposed class—relied on Anthem's misrepresentations and omissions, including those in the network directory disseminated by Anthem, which consumers logically view as the authoritative source of information about their in-network providers, scope of coverage, and other plan policies.

### A) Defendants Were Aware that Anthem's Provider Directory Was Inaccurate and Knew That Its Representations and Omissions Regarding the Provider Directory and Behavioral Health Care Coverage Were Deceptive

303.    At all relevant times, all Defendants knew that Anthem's representations and omissions regarding their directory of behavioral health providers and coverage of behavioral health care were grossly inaccurate, deceptive, and misleading.

304.    In the insurance industry, the accuracy of network directories is of paramount importance, and the consequences of inaccurate network directories are well documented. Indeed, Anthem itself has been successfully sued over the issue.[70]

305.    As discussed above, the industry was recently the subject of a bipartisan congressional inquiry into ghost networks,[71] and the Senate Finance Committee held a hearing on the issue specifically in the context of mental health.[72]

---

Foundation (2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (noting that the combined statistic of those who reported choice of providers as "extremely important" (25 percent) or "very important" (35 percent) is 60 percent).

[70] *See, e.g.*, *Anthem Resolves Calif. Provider Directory Error Case*, Bloomberg Law (Aug. 17, 2016), https://news.bloomberglaw.com/health-law-and-business/anthem-resolves-calif-provider-directory-error-case.

[71] *See Brown, Colleagues, Seek Information on Ghost Networks*, The Ironton Tribune (Feb. 1, 2023), https://www.irontontribune.com/2023/02/01/brown-colleagues-seek-information-on-ghost-networks/.

[72] *See* Senate Hearings on Mental Health Care, *supra* n. 39.

306.    The sheer magnitude of providers who are not in-network or do not accept the Anthem plan—as many as 70 percent of the mental health providers listed—is itself powerful proof of Defendants' knowledge of the directory inaccuracies.

307.    As demonstrated by the secret shopper studies discussed above, in February 2025 (and other times), Defendants coordinated to publish a false list of providers of behavioral, speech, and occupational therapy in New Canaan, Connecticut, and surrounding areas.

308.    In June 2025 (and other times), Defendants coordinated to publish a false list of psychologists, therapists, and providers treating dissociative disorders in Ridgefield, Connecticut, and surrounding areas.

309.    Anthem falsely listed non-existent, unavailable, out-of-network, and nonapplicable providers (*i.e.*, providers of services other than those sought by Plaintiffs and specified in the directory).

310.    Anthem was notified repeatedly since as early as 2014 that its provider directories were inaccurate, especially as to mental and behavioral health providers.

311.    Defendants were incentivized to maintain, generate, and continue to publish inaccurate directories to attract new enrollees, maintain current enrollees, and profit from enrollees' premiums while not actually providing the coverage that Anthem falsely represented that it provided.

312.    On information and belief, at all relevant times, Anthem fraudulently and intentionally maintained and published materially false directories of mental, behavioral, and occupational health providers and speech therapists in Connecticut to deceive current and prospective enrollees about the extent of its provider network. These intentional and fraudulent misrepresentations were made for profit.

313.    On information and belief, Elevance Health Inc. oversaw and directed Anthem to maintain and publish this materially false directory of providers.

314.    On information and belief, Carelon Health Inc. acted in concert with Anthem to maintain and publish this materially false directory of providers.

315.    On information and belief, Defendants coordinated with one another to maintain and publish materially false directories of mental, behavioral, and occupational health providers and speech therapists in Connecticut and to communicate with Plaintiffs about related claims as described above to deceive Plaintiffs about the extent of Anthem's provider network and terms of coverage.

316.    On information and belief, all Defendants knew that Anthem members were having significant problems accessing in-network care.

317.    Defendants' misrepresentations and omissions constitute knowing and willful violations.

318.    Defendants engaged in these knowing deceptive acts and practices to induce Plaintiffs, and all potential members and consumers, to choose the Anthem plan, thereby enriching all Defendants.

319.    These representations about the size and breadth of the behavioral health provider network, the ease of finding behavioral health treatment by using the supposedly accurate provider directory, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the supposedly comprehensive behavioral health care coverage induced Plaintiffs to choose the Anthem plan.

**B)** **Defendants Fail to Provide Coverage for Services Required Under the Policy and by Connecticut and Federal Law**

320.    Defendants repeatedly failed to reimburse Plaintiffs the correct amount they are entitled to for Baby Doe's out-of-network medically necessary care.

321.     Defendants regularly deny exceptions for out-of-network providers when Defendants do not have in-network providers to provide medically necessary care for Baby Doe.

322.    Defendants regularly deny care to Plaintiffs for medically necessary conditions relating to autism and erroneously state that there are treatment limits, which is contrary to Connecticut law.

323.    Defendants regularly apply incorrect amounts to Plaintiffs' deductible obligation.

**C)** **Defendants Reap Significant Benefits from Misrepresenting Their Behavioral Health Provider Network and Coverage**

324.    Anthem knowingly and intentionally mislead consumers by misrepresenting the extent and robustness of their supposed behavioral health provider network, which inures significant financial benefits to all Defendants and deprives Anthem members of the benefit of the bargain for the plan that they chose.

325.    Maintaining an inflated provider network and providing inadequate behavioral health care coverage significantly boosts all Defendants' profits.

326.    Plaintiffs and other consumers who enroll in Anthem's plan pay significant premiums to Anthem in order to receive the promised health insurance coverage. As such, Anthem is unjustly enriched from its misrepresentations about the breadth of its network.

327.    Anthem overcharges Plaintiffs for its premiums because of its illusorily broad network. Every provider who is not actually in-network, or who is unavailable or unable to be contacted, represents coverage for which Anthem is paid but members never receive.[73]

328.    In addition, members with greater behavioral health care needs are disproportionately harmed by the lack of in-network providers. These higher-needs members are more likely to have to pay for out-of-network treatment or abandon their efforts to obtain behavioral health care altogether, thereby saving Defendants the costs associated with their care.

329.    Simply put, Anthem's inaccurate directory increases their membership (along with their increased premiums), and at the same time enables Defendants to evade the costs of actually providing the care.

330.    The financial incentives of intentionally promulgating inaccurate directories were discussed during a recent Senate Finance Committee hearing.[74] In an exchange between United States Senator Elizabeth Warren and testifying witness Mary Giliberti (the Chief Public Policy Officer of Mental Health America), Senator Warren inquired whether the plans were "inaccurate by design," to which Ms. Giliberti responded affirmatively:

> SENATOR WARREN: Okay so it's a way to defraud consumers. To say I have this really big list of people you could go to if you had a problem, and it turns out that really big list . . . is actually this little tiny list.
>
> MS. GILIBERTI: Right.

---

[73] *See* Alicia Atwood & Anthony T. Lo Sasso, *The Effect of Narrow Provider Networks on Health Care Use*, J. of Health Econ. (Dec. 2016), https://doi.org/10.1016/j.jhealeco.2016.09.007.

[74] Note that this discussion focused on Medicare Advantage plans, but the incentives are the same in commercial plans.

SENATOR WARREN: Okay so that's one way it's to their advantage . . . They get paid in effect or they make more money by being inaccurate. Did you have another one?

MS. GILIBERTI: Well, just, that I think it's about 60 percent of the plans [being discussed] don't have out of network coverage, so if you get really frustrated and you pay on your own then they're not paying anything.

SENATOR WARREN: So the more I can frustrate you . . . the more you'll just go somewhere else. And that means it's not money out of their pockets.

\* \* \*

SENATOR WARREN: So, look, what we are really saying here is that it is in the financial interests of these … plans to discourage beneficiaries from accessing care . . . [b]ecause here's the key that underlines this. Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep.[75]

331.    Finally, a significant collateral consequence of an inaccurate, inflated provider directory is that an insurance plan appears to meet federal and state network adequacy requirements, even though it does not. Defendants are thereby unjustly enriched by avoiding the compliance costs and other expenditures associated with maintaining an accurate and adequate network of behavioral health providers, as required by federal and state law.

332.    As explained in a Yale Law & Policy Review article on ghost networks, the effects are far-reaching and damage the very structure of our health care system:

Directory errors cost consumers money and erode regulatory consumer safeguards. They deceive consumers about the value of the coverage they are purchasing by concealing plans' actual provider networks, subjecting consumers to predatory billing practices, and breaking the

---

[75] Senate Hearings on Mental Health Care, *supra* n. 39(Testimony of Senator Elizabeth Warren, which begins at 2:23:58).

link between consumer choices and plan practices that undergirds much
of the American health insurance regulatory structure.[76]

## VII.    Plaintiffs and Putative Class Members Have Been Injured Because of Defendants' Conduct

333.    Simply put, Defendants' ghost network is a dangerous obstacle to critical behavioral health care for the hundreds of thousands of people covered by the Anthem plan. Plaintiffs and others similarly situated have been grievously injured by their inability to access necessary behavioral health treatment for themselves and their children. And small businesses like Amec are harmed by paying for an insurance policy for their employees that does not deliver on the promises for which they contracted.

334.    Even though this issue has been raised in medical journals,[77] Defendants have done little to improve the accuracy of the Anthem directory.

335.    Plaintiffs have suffered enormous injury from Defendants' violations of law. As a result of Defendants' ghost network, Plaintiffs have struggled, or been wholly unable, to obtain the behavioral health treatment they were promised. And the small businesses which help pay the exorbitant cost of health insurance for their employees are being cheated.

336.    Plaintiffs have paid exorbitant and unexpected out-of-network costs to get behavioral health treatment – that was supposed to be provided by their Anthem plan as an in-network benefit – because Defendants maintained and promulgated a ghost network. Plaintiffs

---

[76] Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 YALE L. & POL'Y REV. 78 (2021) at 85.

[77] *See, e.g.*, Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, 39(6) Health Affairs (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501 ("We conducted a national survey of privately insured patients who received specialty mental health treatment. We found that 44 percent had used a mental health provider directory and that 53 percent of these patients had encountered directory inaccuracies.").

have been forced to seek out-of-network care for themselves and for their children; have faced significant delays in receiving critical behavioral health care; have been unable to find care appropriate for their behavioral health needs; have made do with less-than-appropriate providers; and, alarmingly, have been unable to obtain needed behavioral health treatment altogether.

337.    The Anthem provider directory's inaccuracies, misrepresentations, and omissions are the direct and proximate causes of the harms Plaintiffs have endured.

338.    Had the Anthem provider directory been accurate, Plaintiffs would have saved countless hours of futile searching; avoided the time, costs, and emotional toll of delaying, or failing to find, needed care; avoided the exorbitant costs of locating, traveling to, and otherwise obtaining out-of-network behavioral health treatment; and pursued better and less expensive health insurance options.

339.    Had Defendants accurately represented their behavioral health care coverage, Plaintiffs would have had access to the care they were promised or made other financial and medical decisions about their behavioral health treatment.

340.    Had Plaintiffs known in advance about the problems they would encounter trying to get in-network behavioral health care, they would have pursued other health insurance and health care options.

341.    Moreover, Anthem's misrepresentations artificially inflated the market price of its product, causing Plaintiffs to pay more than they otherwise would have for premiums. As a direct and proximate result of Defendants' unfair, deceptive, and fraudulent acts and practices, Plaintiffs suffered injury by paying insurance premiums but failing to receive the benefits promised in exchange.

## CLASS ACTION ALLEGATIONS

342.    This action is brought by Plaintiffs individually and on behalf of a class (the

"Class") pursuant to Federal Rule of Civil Procedure 23. The Class includes all individuals and

employers who have purchased or enrolled in an Anthem health insurance plan in Connecticut at

any point from 2019 through the date of class certification.

343.    Plaintiffs seek certification of the following five Sub-Classes:

A.  **All Class members who are currently, or were previously, enrolled in an ERISA
Anthem health insurance plan in Connecticut at any point from 2019 through the
date of class certification.**

B.  **All Class members who are currently, or were previously, enrolled in a non-ERISA
Anthem health insurance plan in Connecticut at any point from 2019 through the
date of class certification.**

C.  **All Class members who, during the class period, paid for out-of-network care from
a provider listed as in-network on Anthem's provider directory or paid for out-of-
network care when there was no available in-network provider with similar
qualifications within a reasonable distance.**

D.  **All employers who currently or previously purchased an ERISA Anthem health
insurance plan in Connecticut at any point from 2019 through the date of class
certification.**

E.  **All employers who purchased a non-ERISA Anthem health insurance plan in
Connecticut at any point from 2019 through the date of class certification.**

344.    Excluded from the Class are Defendants' officers, directors, employees,

co-conspirators, and legal representatives, and any judge, justice, or judicial officer to whom the

litigation is assigned.

345.    Plaintiffs reserve the right to amend or modify the definition of the Class and Sub-

Classes.

346.    **Numerosity.** The Class as a whole and each of the four Sub-Classes consist of

thousands of individuals and entities, and is thus so numerous that joinder of all members is

impracticable. The exact number and identity of Class members is unknown to Plaintiffs at this time but can be ascertained through appropriate discovery.

347.    **Commonality and predominance.** This action is appropriate as a class action because common questions of law and fact affecting the Class predominate over those questions affecting only individual members. Those common questions include, but are not limited to, the following:

a)    whether Defendants breached their contractual obligations by failing to provide the promised network of providers and/or by failing to comply with ERISA, the No Surprises Act, the MHPAEA, and/or other statutes, regulations, and rules with which Defendants are contractually obligated to comply;

b)    whether Defendants' representations and/or omissions with respect to the Anthem plan were false or misleading under ERISA and Connecticut General Statute §§ 38a-488a, 38a-514, 38a-488b, 38a-514b, 42-110b and/or common law;

a)    whether Defendants' violations of law were willful and knowing;

b)    whether Defendants' behavioral health provider directory was inaccurate and/or inadequate;

c)    whether Defendants failed to disclose to members and prospective members that the provider directory was inaccurate and/or inadequate;

d)    whether a reasonable consumer would be misled by Defendants' acts and practices;

e)    whether Plaintiffs and Class members are entitled to receive specific types of relief such as actual damages, and the methodology for calculating those damages;

f)      whether Plaintiffs and Class members conferred a benefit on Anthem through enrollment in Defendants' plans, payment of premiums, and not utilizing in-network providers or otherwise not obtaining behavioral health care;

g)      whether equity and good conscience require restitution to Plaintiffs and Class members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

348.    **Typicality.** The claims asserted by Plaintiffs are typical of the claims of the Class. At all relevant times, Defendants' provider directory was inadequate and inaccurate, and all Class members' claims arise out of this common source of misrepresentations and omissions. Plaintiffs, like all Class members, were subject to deceptive and misleading representations and omissions found in Anthem's provider directory and other marketing and plan documents regarding the comprehensiveness of behavioral health coverage and the provider network. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members, and Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

349.    **Adequacy of representation.** Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of the Class members. Plaintiffs have retained counsel competent and experienced in class actions and health insurance and consumer protection litigation, who are competent to serve as Class counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the Class members.

350.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)      given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class

members could afford to seek legal redress individually for the wrongs that Defendants have committed against them;

b)        the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for Defendants and burden the courts;

c)        when Defendants' liability has been adjudicated, claims of all Class members can be determined by the Court;

d)        this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

e)        without a class action, many Class members would continue to suffer injury while Defendants retain the substantial proceeds of their wrongful conduct; and

f)        this action does not present any undue difficulties that would impede its management by the Court as a class action.

351.    **Ascertainability.** The identities and addresses of Class members can be readily ascertained from business records maintained by Defendants, and/or self-authentication. The precise number of Class members, and their addresses, can be ascertained from Defendants' records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

352.    Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

### Breach of Contract
### (On behalf of all individual Plaintiffs and Class members enrolled in a non-ERISA plan)

353.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

354.    Plaintiffs and Class members have a direct contractual relationship with Defendants and are also intended third-party beneficiaries of a contract that exists between their employer and Defendants.

355.    As individual purchasers of an Anthem plan, as state and municipal employees eligible to participate in the State plan, or as employees of companies which purchased plans by their small business employers, Plaintiffs and Class members are parties to, and intended third-party beneficiaries of, contracts with Defendants. Like any insurer and insured, Defendants and their members have a direct contractual relationship. The terms of that direct contractual relationship are governed by the insurance materials provided by Defendants, including materials regarding the provider network.

356.    Defendants' failure to provide a network of available providers that is consistent with the representations made in their provider directory and other plan documents violates their contractual commitments. It also violates federal and state laws (including the No Surprises Act, Internal Revenue Code, and Connecticut law) with which Defendants are contractually obligated to comply.

357.    Defendants have violated these federal and state laws (and, by extension, their contractual obligations to Plaintiffs and the Class) by, among other things, failing to ensure behavioral health network adequacy and failing to consistently provide an accurate provider directory.

358.    Defendants have also violated their contractual obligations by denying members the benefits they were promised, including those relating to co-insurance, co-pays, deductibles, and other costs.

359.    Members of the Class (including Plaintiffs) have substantially performed their obligations under the contracts.

360.    Members of the Class (including Plaintiffs) have been damaged by these contractual breaches in several ways. The following is a non-exhaustive list of the types of damage incurred. First, they did not receive the benefits they were entitled to as members of the plan, and for which they paid premiums. For example, they could not find available, in-network providers. In short, they paid inflated premiums for a virtually worthless product. Second, they used out-of-network providers and paid those providers' out-of-network fees for care. Even after the plan reimbursed them the out-of-network allowed amount, these members incurred substantial out-of-pocket cost each time they received treatment – a cost far above their expected co-pay amount. Third, they abandoned their search for care, paying a premium for a service they were supposed to receive and did not, and incurring pain and suffering due to the unsuccessful provider search and their inability to receive treatment. Fourth, Defendants' contractual commitments caused Class members (including Plaintiffs) to pay for and enroll in Defendants' plan, rather than better and/or cheaper plans.

## SECOND CAUSE OF ACTION

### Breach of Contract
**(On behalf of all employer Plaintiffs and Class members which provided non-ERISA plans)**

361.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

362.    Plaintiffs and Class members include entities, such as Amec, which have entered into contracts with Defendants to provide health insurance – including behavioral health benefits – to individual employees.

363.    In and before 2024, Plaintiff Amec offered a non-ERISA plan to its employees.

364.    Defendants' failure to provide a network of available providers that is consistent with the representations made in their provider directory and other plan documents violate their contractual commitments. It also violates federal and state laws (including the No Surprises Act, Internal Revenue Code, and Connecticut law) with which Defendants are contractually obligated to comply.

365.    Defendants have violated these federal and state laws (and, by extension, their contractual obligations) by, among other things, failing to ensure behavioral health network adequacy and failing to consistently provide an accurate provider directory.

366.    Defendants have also violated their contractual obligations by denying members the benefits they were promised, including those relating to co-insurance, co-pays, deductibles, and other costs.

367.    Employer Plaintiffs and Class members were damaged in several ways, including because they did not get the benefit of Defendants' health insurance plans that they were promised and for which they paid.

368.    Employer Plaintiffs and Class members were further damaged because of the harm to their employees. Their employees who sought behavioral health treatment encountered inaccurate, misleading directories and had to spend far more time and energy seeking the care they were entitled to. Many of these employees were unable to find in-network care and had to use out-of-network providers, thus incurring substantial costs and suffering substantial anxiety

and mental anguish. Other employees abandoned the search for care entirely and went untreated. All of this negatively impacted their ability to work and reduced the value of the healthcare benefits their employers offered.

### THIRD CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On behalf of all Plaintiffs and Class members enrolled in a non-ERISA plan)**

369.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

370.    The contracts governing Defendants' relationship with Plaintiffs and Class Members are binding and enforceable. They include an implied covenant, actionable in contract, that Defendants will act in good faith and deal fairly.

371.    Anthem colluded with its sister company Carelon under the direction of parent company Elevance to create, maintain, and promulgate an intentionally inaccurate provider directory.

372.    Defendants materially breached the implied covenant in several respects, including but not limited to the following:

    a)    Defendants have knowingly and intentionally published a provider directory that is grossly inaccurate, thus preventing members from obtaining the medical care they need and contracted for;

    b)    Defendants have knowingly and intentionally failed to maintain, and failed to make a good-faith effort to maintain, an adequate network of providers;

    c)    Defendants have presented providers as being in-network that they knowingly and intentionally disregarded were not, in fact, in-network; and

d) Defendants have knowingly and intentionally denied claims and/or failed to pay claims for providers that were listed as in-network in the directory.

373. Defendants' breaches were conscious and deliberate acts, which were designed to and did unfairly frustrate the agreed common purposes of the contract and which disappointed Plaintiffs' and Class members' reasonable expectations by denying them the benefits of the contract.

374. As a direct and proximate cause of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class members have suffered damages including, but not limited to, having to pay inflated premiums for a virtually worthless product and pay out-of-pocket for services and claims that should have been covered by Defendants.

## FOURTH CAUSE OF ACTION

### Violations of the Connecticut Unfair Trade Practices Act
### (On behalf of all Plaintiffs and Class members)

375. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

376. Defendants have violated the Connecticut Unfair Trade Practices Act, Chapter 735 Section 42 of the Connecticut General Statutes.

377. Connecticut General Statutes § 42-110b imposes liability for engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce" in Connecticut.

378. "[A] violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy."[78]

---

[78] *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 790 (2019) (internal citations omitted).

379.    Plaintiffs may allege violations of Connecticut's Unfair Insurance Practices Act (CUIPA) under Connecticut's Unfair Trade Practices Act (CUTPA).[79]

380.    CUIPA prohibits engaging in "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."[80]

381.    Under CUIPA, an unfair method of competition or an unfair or deceptive act or practice includes "[m]aking, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which [] [m]isrepresents the benefits, advantages, conditions or terms of any insurance policy" as an unfair method of competition or an unfair or deceptive act or practice.[81]

382.    Under CUIPA, an unfair method of competition or an unfair or deceptive act or practice includes "[m]aking, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public" an "assertion, representation or statement with respect to the business of insurance . . . which is untrue, deceptive or misleading."[82]

383.    Defendants violated CUTPA and the public policies established in CUIPA by deceptively and unfairly misrepresenting the breadth of the Anthem provider network in informational and marketing materials and in their online directory and by misrepresenting the health care benefits available to members.

---

[79] *See Dorfman v. Smith*, 342 Conn. 582, 614, 271 A.3d 53, 76 (2022); *see also* Conn. Gen. Stat. § 42-110g (providing for a private right of action in CUTPA).

[80] Conn. Gen. Stat. § 38a-815.

[81] Conn. Gen. Stat. § 38a-816(1).

[82] Conn. Gen. Stat. § 38a-816(2).

384.    Defendants violated CUTPA and the public policies established in CUIPA by falsely representing that Anthem offered an adequate network of providers; that providers listed on the provider directory are in-network; that there are sufficient and available behavioral health care providers in that network; that members can rely on the directory to find and contact providers; and that behavioral health care coverage is comprehensive.

385.    Defendants again violated CUTPA and the public policies established in CUIPA by omitting and concealing the likelihood that an Anthem member seeking behavioral health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures needed to find appropriate behavioral health care.

386.    Under Conn. Gen. Stat. § 38a-488b, coverage for the care and treatment of autism spectrum disorder "shall not impose . . . *any limits on the number of visits* an insured may make to an autism spectrum disorder services provider pursuant to a treatment plan on any basis other than a lack of medical necessity."[83]

387.    Defendants violated CUTPA and the public policies established in Conn. Gen. Stat. § 38a-488b(1) by imposing a limit on the number of medically necessary visits they would cover for the treatment of autism spectrum disorder.

388.    Under Conn. Gen. Stat. § 38a-488b, coverage for the care and treatment of autism spectrum disorder "shall not impose . . . a coinsurance, copayment deductible or other out-of-pocket expense for such coverage that places a *greater financial burden* on an insured for access to the diagnosis and treatment of autism spectrum disorder than for the diagnosis and treatment of any other medical, surgical, or physical health condition under such policy."[84]

---

[83] Conn. Gen. Stat. § 38a-488b(1) (emphasis added).

[84] Conn. Gen. Stat. § 38a-488b(2) (emphasis added).

389.    Defendants violated CUTPA and the public policies established in Conn. Gen. Stat. § 38a-488b(2) by requiring their members—including Plaintiffs—to pay higher out-of-pocket costs for the treatment of autism spectrum disorder than for the treatment of other conditions.

390.    Defendants violated CUTPA by knowingly and intentionally issuing determinations that medically necessary behavioral health treatments were not medically necessary, denying claims for behavioral health benefits based on the number of visits, denying claims for behavioral health benefits based on the false premise that in-network providers were available, and taking inconsistent positions on—and denying claims under—approved behavioral health treatment plans.

391.    Insurance companies have a statutory obligation under Conn. Gen. Stat. § 38a-477h(b)(1) to provide accurate and complete information about their health care plans. In particular, every carrier is required to "post on its Internet web site a current and accurate participating provider directory, updated at least monthly, for each of its network plans."[85]

392.    Anthem violated CUTPA and the public policies established in Conn. Gen. Stat. § 38a-477(b)(1) by deceptively and unfairly posting false, misleading, and outdated information about their network providers on their web sites, misrepresenting the scope of their network and leading consumers—including Plaintiffs—to believe their network of providers was more robust than it was.

393.    Insurance companies have a statutory obligation under Conn. Gen. Stat. § 38a-477h (d)(1)(A) to make available in their electronic participating provider directory for each

---

[85] Conn. Gen. Stat. § 38a-477(b)(1).

network plan "the health care provider's name, gender, participating office location or locations, specialty, . . . [and] whether such health care provider is accepting new patients."[86]

394.    Anthem violated CUTPA and the public policies established in Conn. Gen. Stat. § 38a-477h (d)(1)(A) by deceptively and unfairly posting a directory filled with false, misleading, and outdated information about providers' location, specialty, and whether they were accepting new patients, making the directory useless to consumers—including Plaintiffs—who were looking for a provider that was right for their medical needs.

395.    Anthem assured Plaintiffs and Class members that its provider network was adequate and robust and that the information contained in its provider directory was accurate and up-to-date. In reality, however, all Defendants knew that the information Anthem was providing was false, that its directory was grossly inflated and inaccurate, and that those who enrolled in the Anthem plan could not obtain the behavioral health care coverage that Anthem promised.

396.    Defendants intentionally deceived Plaintiffs and Class members in order to maximize profits, attract members under false pretenses, reduce costs, and create the false appearance that they were complying with federal and state law.

397.    Anthem's representations and omissions about the scope of its provider network caused consumers—including Plaintiffs—to enroll in the health insurance Anthem offered.

398.    Defendants' violations of CUTPA and the public policies established in CUIPA, Conn. Gen. Stat. § 38a-488b(1)–(2), Conn. Gen. Stat. § 38a-477(b)(1), Conn. Gen. Stat. § 38a-477h (d)(1)(A), have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary losses. Among other injuries, Defendants' misrepresentations and omissions have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo

---

[86] Conn. Gen. Stat. § 38a-477h (d)(1)(A).

crucial and necessary behavioral health care; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; caused Plaintiffs and Class members to enroll in Anthem's plan, as opposed to better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; caused Plaintiffs and Class members to suffer severe emotional and psychological distress; and prevented employers' employees from receiving the behavioral health benefits they expected as part of their employment; and negatively impacted employees' ability to work.

### FIFTH CAUSE OF ACTION

### Fraudulent Misrepresentation
### (On behalf of all Plaintiffs and Class members)

399.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

400.    Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans.

401.    Defendants made deceptive affirmative misrepresentations and omissions to Plaintiffs and Class members by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. Defendants' misrepresentations were conveyed in Defendants' online directory and other marketing materials. The provider directory itself, on which Plaintiffs, as well as other plan members and prospective members, were directed to rely and did rely, intentionally inflated and misled them regarding the breadth and adequacy of the network and the availability of behavioral health providers.

402.    The omissions from these same materials include, *inter alia*, reference to the

limited number of behavioral health providers who are actually in-network and actually accepted

the Anthem insurance, and to the fact that members and prospective members have to utilize

out-of-network providers—and incur substantial costs—should they need behavioral health

services.

403.    False representations include, *inter alia*, that Defendants have an adequate

network of providers; that providers listed on the provider directory are in-network; that there are

sufficient and available behavioral health care providers in that network; that providers listed as

accepting new patients actually accept new patients; that members can rely on the directory to

find and contact providers with the listed qualifications offering the listed services; and that

behavioral health care coverage is comprehensive.

404.    Omitted and concealed from the representations were material and relevant facts

that Plaintiffs and Class members would have used in selecting their health insurance plan,

including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the

provider network; the likelihood that a member seeking behavioral health care would have to

obtain out-of-network treatment, and the costs of such services; and the number of hours and

expenditures that would be needed to find appropriate behavioral health care.

405.    These misrepresentations and omissions were intended to, and did, induce

reliance by Plaintiffs and Class members as to the services and benefits that would be delivered

to them as a result of choosing Defendants' plan. Plaintiffs and Class members chose to enroll in

their Anthem plan (instead of better, cheaper options) based on the lies Defendants told about the

mental health benefits they would receive under the plan, including the supposedly robust

provider network that would be available to them.  And Plaintiffs and Class members

detrimentally relied on the inaccurate provider directory when searching for in-network providers.  That detrimental reliance caused them to waste countless frustrating hours searching in vain for available, in-network providers.

406.    Plaintiffs and Class members justifiably relied on Defendants' representations and omissions, as Defendants had unique knowledge of the facts underlying their representations.

407.    These fraudulent misrepresentations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that Defendants' provider directory was accurate and broad and that behavioral health care would be covered to the full extent that Defendants represented. A reasonable consumer would—and Plaintiffs and Class members did—attach importance to such representations and would be induced to enroll Defendants' health insurance.

408.    These fraudulent misrepresentations and omissions alleged herein were intentional and materially misleading. Defendants intentionally led Plaintiffs and Class members to believe that their network of available providers was adequate and robust in order to induce them to enroll in, and remain enrolled in, their plan and to prevent them from receiving promised care. Such deception was designed to, and did, allow Defendants to reap enormous financial gain through increased income (by way of premiums paid by Plaintiffs and Class members) and reduced costs (by way of delayed, forgone, and unreimbursed care and avoidance of the expenses that would be incurred by creating and maintaining a robust provider network and accurate provider directory).

409.    These fraudulent misrepresentations and omissions have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary losses. Among other injuries, Defendants' misrepresentations and omissions have caused millions of dollars in

damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary behavioral health care; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; caused Plaintiffs and Class members to enroll in Defendants' plan, as opposed to better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

410.    Defendants willfully and knowingly made the fraudulent misrepresentations and omissions alleged herein. Their effort to include affirmative misrepresentations and omissions in their marketing materials and provider directory was undertaken intentionally to induce individuals to choose their plan over other plans and to prevent them from obtaining covered care, thus increasing their profits.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation
### (On behalf of all Plaintiffs and Class members)

411.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

412.    Insurance companies have a statutory and common law duty to provide accurate and complete information about their health care plans and provider networks.

413.    Nevertheless, Defendants negligently misrepresented their provider network and the availability of behavioral health providers.

414.    Defendants' false representations include, *inter alia*, that they have an adequate network of providers; that providers listed on the provider directory are in-network and

accessible; that there are sufficient and available behavioral health care providers in that network; that members can rely on the directory to find and contact providers; and that behavioral health care coverage is comprehensive.

415.    Omitted and concealed from Defendants' representations were material and relevant facts that Plaintiffs and Class members used, and would have used, in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking behavioral health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures  needed to find appropriate behavioral health care.

416.    Plaintiffs and the Class justifiably relied upon the information that Defendants provided. Plaintiffs and Class members chose to enroll in their Anthem plan (instead of better, cheaper options) based on the lies Defendants told about the provider network.  And Plaintiffs and Class members detrimentally relied on the inaccurate directory when searching for in-network providers.

417.    Defendants have not used reasonable care or competence in providing accurate information about their network of providers and in publishing their provider directory.

418.    As a direct and proximate cause of Defendants' negligent misrepresentations, Plaintiffs and Class members have sustained damages. Among other injuries, Defendants' negligent misrepresentations have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary behavioral health care; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs;

caused Plaintiffs and Class members to enroll in Defendants' plan, as opposed to better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment
### (On behalf of all Plaintiffs and Class members)

419.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

420.    Defendants have been and continue to be significantly and unjustly enriched as a result of their inaccurate provider directory and inadequate behavioral health provider network. Because they portrayed the network as comprehensive, Plaintiffs and countless other individuals selected their plan over other plans, paid substantial premiums, and did not receive the care to which they were entitled. As a result, Defendants' market share and profits increased and their costs decreased, thus unjustly enriching them at Plaintiffs' and Class members' expense. Defendants' lies artificially inflated the price of, and induced Plaintiffs to enroll in, Anthem's plan, which increased the premiums paid to Anthem and, by extension, the money Anthem paid to Carelon and Elevance.

421.    Plaintiffs and Class members have conferred a benefit on Defendants by enrolling in Anthem's health insurance and thereby directing their medical premiums to Defendants.

422.    Plaintiffs and Class members have further conferred a benefit on Defendants because Defendants' inaccurate and inadequate network has forced Plaintiffs and Class members to pay a portion of the behavioral health care expenses that Defendants represented would be covered. Effectively, Defendants have represented that their insurance broadly covers behavioral

health care (including care from providers listed in their directory), yet their bait-and-switch tactics ensure that they do not pay the full costs of actually covering such behavioral health care services.

423.    Defendants have thus enriched themselves by reaping the benefits of increased membership while reducing or eliminating their own coverage, reimbursement, and other financial duties. These and other benefits were obtained at the expense of Plaintiffs and Class members, who did not receive the full value of what they were owed.

424.    In addition, Defendants' inflated behavioral health provider network has made it appear as if they comply with statutory and regulatory requirements that their provider network be sufficient, adequate, and accurate, thereby saving them the costs of actual compliance with these requirements—shielding them from government investigation, and the associated costs, at the expense of their members.

425.    An unjust enrichment cause of action is appropriate because Defendants failed to make restitution to Plaintiffs and Class members for the economic and non-economic harms, including out-of-pocket costs unjustly incurred.

426.    It is inequitable and unjust for Defendants to retain the benefits from falsely portraying their provider network in a way that increases enrollment while decreasing Defendants' obligations to do exactly what they say they will do with respect to providing coverage for behavioral health treatment.

427.    These expenses and inconveniences should have been borne by Defendants. The profits made by Defendants as a result of their misconduct should be disgorged.

## EIGHTH CAUSE OF ACTION

## Improper Denial of Benefits under ERISA

**(On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)**

428.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

429.    Plaintiffs purchased and/or enrolled in an ERISA plan.  They bring this count on their own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. § 1132(a)(1)(B) for damages at law.

430.    Defendants were responsible for reviewing, processing, and making final decisions approving or denying Plaintiffs' claims under the plan.

431.    Defendants improperly denied Plaintiffs' and Class members' claims for coverage and reimbursement for health services covered under the terms of the plan and Defendants' agreements under the plan.

432.    Defendants improperly denied claims for coverage and reimbursement, in part, based on the faulty premise that in-network providers were available to provide the requested services.

433.    In reality, because of Defendants' ghost network, in-network providers within a reasonable distance of Plaintiffs were unavailable to provide Plaintiffs' requested services. This lack of providers—despite the false representations in Defendants' directories that numerous in-network providers were available to provide the requested services—denied Plaintiffs the coverage and benefits due to them under the plan.

434.    Defendants improperly failed to provide the health coverage affirmed under the plan; failed to reimburse Plaintiffs in accordance with the terms of the plan; failed to accurately apply Plaintiffs' expenditures to their deductibles in accordance with the terms of the plan; and

failed to accurately calculate out-of-network coverage and coinsurance rates for Plaintiffs' claims under the plan.

## NINTH CAUSE OF ACTION

### Breach of Fiduciary Duty under ERISA
### (On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)

435.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

436.    Plaintiffs the Mazzolas and Amec purchased and/or enrolled in an ERISA plan. They bring this count on their own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) & (a)(3) for equitable relief and damages at law.

437.    Defendants are responsible for interpreting the plans they administer and formulating policies and guidance for beneficiaries under the plans. Defendants are also responsible for maintaining the accuracy of plan materials, including provider directories. Defendants are additionally responsible for making final and binding decisions about whether to approve coverage requested by plan members. As such, Defendants exercise discretionary authority with respect to the administration of the plans and the payment of plan benefits. Defendants are therefore ERISA fiduciaries as defined by 29 U.S.C. §§ 1002(21)(A) and 1104(a).

438.    As ERISA fiduciaries, and pursuant to 29 U.S.C. § 1104(a), Defendants have a duty of loyalty to plan participants and beneficiaries which requires them to discharge their duties "solely in the interests of the participants and beneficiaries" of the plans they administer and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plans.

439.    Defendants also owe plan participants and beneficiaries a duty of care, which requires them to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plan.

440.    Defendants violated their fiduciary duties of loyalty and care to Plaintiffs and Class members by grossly inflating the size of their provider network and exaggerating plan benefits in order to increase enrollment and profits. Defendants knew that beneficiaries would not receive the coverage and benefits falsely represented in plan materials, including the provider directory, but made these misrepresentations to enrich themselves at the expense of Plaintiffs and Class members.

441.    Defendants elevated their own financial interests above the interests of the plan participants and beneficiaries, by failing to pay the appropriate amounts to providers who Defendants classified as Authorized Service providers, thereby causing these plan participants and beneficiaries significant damages.

442.    Plaintiffs seek mandatory injunctive relief in the form of an order requiring Defendants to revise and regularly update their provider directories to ensure they are accurate and current. Defendants should be enjoined from further publishing directories that include erroneous information about providers who do not exist, are no longer practicing, are not accepting new patients, are not providing the specified services or specialties, or are not part of the Defendants' network.

443.    Plaintiffs further seek a mandatory injunction requiring the Defendants to establish and maintain an adequate network of mental health providers.

444.     Plaintiffs further request surcharge to prevent unjust enrichment of the Defendants. The Defendants pocketed inflated premiums from class members for years based on inaccurate provider directories and misleading marketing materials.

445.     Plaintiffs further request equitable relief to make them whole for their inability to obtain care and treatment under the Defendant's plan.

## TENTH CAUSE OF ACTION

### Parity in Mental Health Benefits under ERISA & MHPAEA
### (On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)

446.     Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

447.     Plaintiffs the Mazzolas and Amec purchased and/or enrolled in an ERISA plan. They bring this count on their own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and 1185a for equitable relief and damages at law.

448.     Defendants, in administering a group health plan that provides both medical and surgical benefits and mental health benefits, included financial requirements and treatment limitations applicable to mental health benefits that were more restrictive than those applied to substantially all medical and surgical benefits covered by the plan.

449.     29 C.F.R. § 2590.712(c)(4)(ii)(D) provides that nonquantitative treatment limitations include "[s]tandards related to network composition, including but not limited to . . . procedures for ensuring the network includes an adequate number of each category of provider and facility to provide services under the plan or coverage." 29 C.F.R. § 2590.712(c)(4)(iii)(A) requires insurers to "collect and evaluate relevant data . . . on relevant outcomes related to access to mental health and substance use disorder benefits and medical/surgical benefits." Finally, 29

C.F.R. § 2590.712(c)(4)(iii)(B) requires that where there are "material differences in access to mental health and substance abuse disorders as compared to medical/surgical benefits" the insurer must take "reasonable action . . . to address the material differences to ensure compliance."

450.    Among the many ways in which Defendants created a disparity in benefits, Defendants did not provide a network of mental health providers commensurate with their network of medical/surgical providers. Defendants also consistently denied claims for coverage of mental health services as not medically necessary when the true reason for the denial of coverage was the lack of available in-network providers of mental health services and to avoid the cost of covering services from out-of-network mental health providers. Defendants did not apply such treatment limitations to claims for medical and surgical benefits because in-network providers for medical and surgical treatments were more widely available under Defendants' health insurance.

451.    Defendants did not collect and evaluate relevant data on access to mental health disorder benefits and medical/surgical benefits, carefully consider the impact on parity, or take reasonable action to address the material differences in network adequacy.

452.    Defendants processes for ensuring network adequacy for mental health disorder providers were less rigorous and less effective than the processes applied to medical/surgical providers.

453.    By falsely representing the scope of available in-network mental health providers, Defendants required Plaintiffs and Class members to disproportionately seek treatment from out-of-network providers and pay higher costs than required of beneficiaries seeking medical and

surgical benefits. This financial requirement was more restrictive for mental health benefits than for medical or surgical benefits.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

a.    declaring that the instant action may be maintained as a class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.    awarding all injunctive relief permitted by law or equity;

c.    awarding compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

d.    awarding statutory damages and penalties in addition to actual damages;

e.    awarding treble damages;

f.    awarding punitive damages in an amount deemed appropriate by the Court;

g.    awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

h.    awarding Plaintiffs reasonable attorneys' fees and costs;

i.    interest pursuant to Conn. Gen. Stat. § 37-3 *et seq*.; and

j.    awarding Plaintiffs and the Class such other relief as this Court may deem just and proper under the circumstances.

* * *

454.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: December 1, 2025

**IZARD, KINDALL & RAABE, LLP**

By: /s/ *Craig A. Raabe*
Craig Raabe (ct01601)
Robert Izard (ct04116)
Seth Klein (ct18121)
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
craabe@ikrlaw.com

**POLLOCK COHEN LLP**

By: /s/ *Adam Pollock*
Adam Pollock (ct 31912)
Steve Cohen*
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Adam@Pollockcohen.com
Scohen@PollockCohen.com

**WALDEN MACHT HARAN & WILLIAMS LLP**

By: /s/ *Jacob Gardener*
Jacob Gardener*
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

*\* to be admitted pro hac vice*

*Attorneys for Plaintiffs*